## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **SOSCIA HOLDINGS, LLC;** | : | |
| **STRUCTURES AT JOHNSON'S POND, LLC;** | : | |
| **BOATING AT JOHNSON'S POND, LLC;** | : | |
| **WATERFRONT AT JOHNSON'S POND, LLC;** | : | |
| **COMMON AREA AT JOHNSON'S POND,** | : | |
| **LLC; and LAND AT JOHNSON'S POND, LLC,** | : | |
| *Plaintiffs*, | : | |
| | : | |
| **v.** | : | **Case No. _____** |
| | : | |
| **TOWN OF COVENTRY;** | : | |
| **TOWN OF COVENTRY,** *by and through its* | : | |
| *Finance Director Robert J. Civetti, in his Official* | : | |
| *Capacity*; | : | |
| **HILLARY V. LIMA,** *in her Official* | : | |
| *Capacity as Council President and Individually*; | : | |
| **JAMES E. LEBLANC**, *in his Official Capacity* | : | |
| *as Council Vice President and Individually*; | : | |
| **JONATHAN J. PASCUA,** *in his Official* | : | |
| *Capacity as Councilmember and Individually*; | : | |
| **ALISA M. CAPALDI,** *in her Official Capacity as* | : | |
| *Councilmember and Individually*; | : | |
| **KIMBERLY A. SHOCKLEY,** *in her Official* | : | |
| *Capacity as Councilmember and Individually*; | : | |
| **JENNIFER M. LUDWIG,** *in her Official* | : | |
| *Capacity as Councilmember and Individually*; | : | |
| **DANIEL O. PARILLO, JR.,** *in his Official* | : | |
| *Capacity as Town Manager and Individually*; | : | |
| **STEPHEN J. ANGELL, ESQ.,** *in his Official* | : | |
| *Capacity as Town Solicitor and Individually*, | : | |
| *Defendants*. | : | |

## PLAINTIFFS' COMPLAINT

### *Introduction*

"[N]or shall private property be taken for public use, without just compensation." U.S.

Const. amend. V. This constitutional provision known as the "Takings Clause" was "designed to

bar Government from forcing some people alone to bear public burdens which, in all fairness and

justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

In *Kelo v. City of New London*, 545 U.S. 469 (2005), a 5-4 decision of the United States Supreme Court cautiously expanded the definition of "public use," which it equated to "public purpose," to enable governmental bodies to acquire private property for economic redevelopment purposes. *Kelo*, 545 U.S. at 483-84. However, the *Kelo* Court stressed the importance of the "carefully formulated . . . economic development plan" used by the City of New London, which was specifically authorized by a State statute allowing municipalities to use eminent domain to promote economic redevelopment. *Id.* In addition, *Kelo* held that the States may limit economic redevelopment takings beyond the federal baseline. *Id.* at 489.

In fact, the State of Rhode Island—through the Rhode Island Supreme Court and the Rhode Island General Assembly—has limited economic redevelopment takings since *Kelo*. *See generally Rhode Island Economic Development Corp. v. The Parking Co., L.P.*, 892 A.2d 87 (R.I. 2006); R.I. Gen. Laws §§ 45-32-1 *et seq.*; R.I. Gen. Laws §§ 42-64.12-1 *et seq.* State law limits economic redevelopment takings to statutory parameters, and there are robust procedural safeguards to protect private property owners from unlawful takings.

In the present case, the Town of Coventry and its employees sought to acquire Johnson's Pond (the "Pond"), a renowned 938-acre freshwater reservoir used for recreational purposes, by condemning the Pond and paying the Plaintiffs a nominal sum. The Town publicly claimed that it was taking the Pond for recreational purposes and public safety, and it then used a "quick take" procedure under State law designed for public highway takings. However, behind the scenes, the Town schemed to take the Pond for economic redevelopment purposes and to turn the Pond into a "profit machine." Moreover, the Town, based upon guidance from their Solicitor Stephen J.

Angell, Esq., planned to fund the Taking using a tax increment financing (TIF) district comprised of private property owners who live around the Pond.

Realizing that the actual "public purpose" of redevelopment did not qualify for an economic redevelopment taking under applicable State law, the Town created a pretextual "public purpose" of safety and recreation, and it shoehorned the condemnation into the inapplicable "quick take" statute. Thus, not only was the Taking not for a "public use" or "public purpose," but the Town also violated the Due Process Clause of the Fifth and Fourteenth Amendment. Further, aside from the impropriety of the Taking, the "just compensation" proffered by the Town of $157,000.00 for the Taking is a blatant violation of the Just Compensation Clause, particularly since the Town offered over $1.5 million to settle prior to the Taking.

The Plaintiffs bring their claims in the United States District Court for the District of Rhode Island to vindicate their rights under the United States Constitution. In doing so, they rely upon *Knick v. Township of Scott, Pennsylvania*, 588 U.S. 180 (2019), which overruled the state-litigation requirement for takings established by *Williamson County* and "restor[ed] takings claims to the full-fledged constitutional status the Framers envisioned when they included the Clause among the other protections in the Bill of Rights." *Knick*, 588 U.S. at 189. As set forth below, the Plaintiffs also allege claims under the Due Process Clause, 42 U.S.C. § 1983, and the Declaratory Judgment Act. And finally, the Plaintiffs request this Court to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over their pendent State law claims.

### *Parties*

1. Soscia Holdings, LLC ("Soscia") is a Rhode Island limited liability company with its principal office located in Coventry, Rhode Island.

2.  Structures at Johnson's Pond, LLC is a Rhode Island limited liability company with its principal office located in Coventry, Rhode Island.

3.  Boating at Johnson's Pond, LLC is a Rhode Island limited liability company with its principal office located in Coventry, Rhode Island.

4.  Waterfront at Johnson's Pond, LLC is a Rhode Island limited liability company with its principal office located in Coventry, Rhode Island.

5.  Common Area at Johnson's Pond, LLC is a Rhode Island limited liability company with its principal office located in Coventry, Rhode Island.

6.  Land at Johnson's Pond, LLC is a Rhode Island limited liability company with its principal office located in Coventry, Rhode Island.

7.  When Soscia is referred to collectively **<u>with</u>** Structures at Johnson's Pond, LLC, Boating at Johnson's Pond, LLC, Waterfront at Johnson's Pond, LLC, Common Area at Johnson's Pond, LLC, and Land at Johnson's Pond, LLC, all of the entities are referred to as "the Plaintiffs."

8.  When Structures at Johnson's Pond, LLC, Boating at Johnson's Pond, LLC, Waterfront at Johnson's Pond, LLC, Common Area at Johnson's Pond, LLC, and Land at Johnson's Pond, LLC are referred to **<u>without</u>** Soscia, they shall be collectively referred to as "the Holding Companies."

9.  The Town of Coventry (the "Town") is a municipal corporation located in the State of Rhode Island. The Town is sued directly and also by and through its Finance Director, Robert J. Civetti in his official capacity.

10. Hillary V. Lima ("Lima") is domiciled in Rhode Island and is the Council President of the Coventry Town Council. Lima is sued in both her official and individual capacities.

11. James E. LeBlanc ("LeBlanc") is domiciled in Rhode Island, and at all relevant times, was the Vice Council President of the Coventry Town Council. LeBlanc is sued in both his official and individual capacities.

12. Jonathan J. Pascua ("Pascua") is domiciled in Rhode Island and is a Councilmember of the Coventry Town Council. Pascua is sued in both his official and individual capacities.

13. Alisa M. Capaldi ("Capaldi") is domiciled in Rhode Island and is a Councilmember of the Coventry Town Council. Capaldi is sued in both her official and individual capacities.

14. Kimberly A. Shockley ("Shockley") is domiciled in Rhode Island, and at all relevant times, was a Councilmember of the Coventry Town Council. Shockley is sued in both her official and individual capacities.

15. Jennifer M. Ludwig ("Ludwig") is domiciled in Connecticut, and at all relevant times, was a Councilmember of the Coventry Town Council. Ludwig is sued in both her official and individual capacities.

16. Daniel O. Parillo, Jr. ("Parillo") is domiciled in Rhode Island and is the Town Manager for the Town of Coventry. Parillo is sued in both his official and individual capacities.

17. Stephen J. Angell, Esq. ("Angell") is domiciled in Rhode Island and is the Town Solicitor for the Town of Coventry. Angell is sued in both his official and individual capacities.

18. When all of the Defendants are referred to collectively in this Complaint, they are referred to as "the Defendants." Otherwise, they are referred to by their names, or sometimes as the "Official Defendants" or "Individual Defendants" as may be appropriate.

### ***Jurisdiction***

19. This Court has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1331, 28 U.S.C. §§ 2201 *et seq*. (the "Declaratory Judgment Act"), and 42 U.S.C. § 1983.

20. This Court has supplemental jurisdiction over the State law claims set forth in this Complaint under 28 U.S.C. § 1367, as they are so related to claims in this action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the United States Constitution.

21. This Court has general personal jurisdiction over the Defendants who, upon information and belief, are all domiciled in Rhode Island, except Ludwig. The Court also has specific personal jurisdiction over the Defendants to the extent general personal jurisdiction is lacking.

22. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because all Defendants, except Ludwig, are residents of Rhode Island, a substantial part of the events giving rise to the claims in this Complaint occurred in this judicial district, the property subject to this action is located in this judicial district, and/or the Defendants are generally subject to personal jurisdiction in the State of Rhode Island.

### *Facts*

### *General Background*

23. In 1846, the Rhode Island General Assembly incorporated the Quidnick Reservoir Company ("Quidnick") for the purpose of erecting, establishing, maintaining, and keeping in order dams and reservoirs on the waters of the Pawtuxet River and its branches (the "Quidnick Charter"). *See* **Exhibit 1** (Quidnick Charter).

24. Quidnick was authorized to assess and tax mill estates along the river to support the maintenance and operation of the dams and reservoirs.

25. Under the Quidnick Charter, Quidnick and its successors and assigns were authorized to build and maintain dams and reservoirs and to use such for the benefit of the corporation and its members, who were originally mill owners.

26. To effectuate the Quidnick Charter and its purpose, Quidnick acquired rights in over 100 lots and constructed several reservoirs and dams, creating an integrated water system, portions of which are part of the Flat River Reservoir, known colloquially as "Johnson's Pond." *See, e.g.*, **Exhibit 2** (1904 Survey); **Exhibit 3** (Integrated Water System Map).

27. After building the dams, Quidnick sold surplus upland and reserved flowage easements over lands below the high water mark of the reservoirs, retaining fee-simple ownership of completely submerged lands.

28. The General Assembly amended its legislation at Quidnick's request in 1867, 1972, and 1975, affirming Quidnick's status and powers as a public corporation.

29. In January of 1982, Quidnick petitioned to become a private corporation, which the General Assembly approved in May of 1982.

30. This amendment allowed Quidnick to retain title to the reservoirs and granted it additional permission to create and sell hydroelectric power, along with any other lawful purpose.

31. Later that year, Quidnick and the Town of Coventry agreed that the Town would maintain the dams to facilitate recreational use and access for residents.

32. This agreement was renegotiated in 1994, resulting in a 15-year lease where Quidnick aimed to maintain superior water levels for recreational purposes.

33. A similar lease was signed in 2009, allowing the Town to regulate and profit from recreational activities. *See* **Exhibit 4** (Lease).

34. The Lease also allowed the Town to permit the residents living around the Pond to have access rights to the Pond, whereby they would otherwise have none, as these access rights were owned by Quidnick (and ultimately assigned to Soscia).

35. In March of 2020, Soscia Holdings, LLC ("Soscia") purchased all of Quidnick's rights in Coventry, including land and water rights, flowage easements, and submerged lands in Flat River Reservoir ("Johnson's Pond" or the "Pond") and other waters. *See, e.g.* **Exhibit 5A** (Soscia Deed); **Exhibit 5B** (Water Rights Agreement).

36. The rights of flowage and to submerged lands are described in the Soscia Deed as Parcel II. The rights to approximately 100 acres of upland purchased in connection therewith by Soscia from Quidnick are described as Parcel I in the Soscia Deed.

37. The 2009 Quidnick Lease was also assigned to Soscia in 2020.

***Property Details***

*The Integrated Water System*

38. By virtue of its purchase, Soscia, along with its successors and assignees, hold the authority to control, utilize, and profit from the waters within its reservoirs and the Pawtuxet River in the Town of Coventry, which create an Integrated Water System. *See* **Ex. 3** (Integrated Water System Map).

39. These rights encompass the ability to build and maintain dams and reservoirs, produce, and sell hydroelectric power, and engage in any other lawful activities.

40. The Integrated Water System is comprised of Stump Pond, the Flat River Reservoir, the South Branch of the Pawtuxet River, Maploot Pond, and Tiogue Lake.

41. Stump Pond serves as a recharge reservoir for the Flat River Reservoir.

42. The Flat River Reservoir Dam impounds the waters of the Flat River, Maploot Pond, and the Big River Management Area.

43. The discharge from the Flat River Reservoir Dam regulates the South Branch of the Pawtuxet River, which includes 10 dams and merges with the North Branch of the Pawtuxet in West Warwick, Rhode Island.

44. Ultimately, the Pawtuxet River discharges into the Narragansett Bay.

45. See below for a map of the Integrated Water System, which is also found in **Exhibit 3**:



*Stump Pond*

46. The Coventry Reservoir, commonly referred to as "Stump Pond," and referred to as Map 0318, Lot 204.004 on the Town of Coventry Tax Assessor's Map, spans approximately 175 acres of surface area.

47. The reservoir serves as a crucial recharge source for the Flat River Reservoir, contributing to its replenishment and overall water balance.

48. Positioned strategically, Stump Pond discharges directly into the Flat River Reservoir, enhancing its water supply and supporting its ecological stability.

*The Flat River Reservoir (or "Johnson's Pond")*

49. The Flat River Reservoir (referred to in this Complaint as "Johnson's Pond" or "the Pond"), encompassing approximately 938 surface acres and holding 6,000 acre-feet at "normal pool," is the largest, privately owned, freshwater recreational reservoir in Rhode Island.

50. The Pond is ideal for boating, swimming, fishing, and other forms of water recreation.

51. Johnson's Pond is known as one of the best largemouth bass fisheries in the State and holds trophy size northern pike.

52. Renowned as the home of the State record largemouth bass (11 lbs., 3.2 oz., caught in Johnson's Pond in 2016), Johnson's Pond is estimated to provide at least 10,000 user-days of fishing per year.

53. The Pond is surrounded by over 700 homes and 2 campgrounds, with an additional 20 homes currently under construction.

54. More than 400 additional homes have secondary access to the Flat River Reservoir.

55. The 2 campgrounds collectively feature approximately 268 boat slips and 2 boat ramps, and the Pond hosts over 900 docks.

56. Annually, an estimated 2,500 boats and personal watercraft utilize the Pond for recreational activities.

57. Private waterfront access significantly enhances waterfront property values, adding approximately $158,136.16 per house lot, according to the 2023 Coventry Tax Assessor records.

58. Historically, the Pond was used to store water for industrial use and power generation by the downstream industries that comprised the Quidnick Reservoir Company.

59. Most abutters do not own land under Johnson's Pond, though some do, with Soscia maintaining a flowage easement over such lands.

60. As Johnson's Pond is artificial, manmade, and non-navigable, there are no natural riparian rights to the water granted to abutters of the Pond.

61. By virtue of the Soscia Deed and Water Rights Agreement, Soscia holds exclusive control over the water levels, recreational uses, and access to Johnson's Pond.

*The Flat River Dam*

62. The Flat River Dam ("the Dam") sits towards the eastern end of Johnson's Pond where the Pond drains into the South Branch of the Pawtuxet River.

63. The Dam was constructed in 1873 after a previous dam was breached during a storm.

64. The reconstruction of the Dam involved raising the Dam's height by 3 feet, replacing the former mill with the current outlet pipes and gatehouses, and expanding the spillway from 2 to 5 bays.

65. The Dam's maximum spillway capacity is 12,000 cubic feet per second (CFS), and its discharge is measured approximately 2.3 miles downstream at a United States Geological Survey Station.

66. The original purpose of the Dam was to impound water for power generation and process use by Quidnick's members.

67. Today, the water impounded by the Dam is used for recreation, although the water released by the Dam into the Pawtuxet River is still used by some downstream industries.

68. Operation of the Dam was subject to the Lease between Soscia and the Town until the Lease terminated on March 31, 2024.

*The Upland Parcel*

69. By way of its Deed, where it is referred to as Parcel II, Soscia also owned approximately 100 acres of prime, waterfront property (the "Upland Parcel").

70. The Upland Parcel is referred to as 1660 Flat River Road, Tax Assessor's Map 59, Lot 5.

71. The Upland Parcel, which includes the Dam, is uniquely zoned for both Industrial and Residential use.

72. This distinctive zoning makes it the only parcel adjacent to the Pond with an Industrial designation.

73. The Upland Parcel is divided by the South Branch of the Pawtuxet River, and it features "Industrial 1" zoning extending from the northwest lot line to the northeast lot line, encompassing the area up to the spillway discharge for the Dam.

74. This "Industrial 1" zone benefits from an 80-foot paved right of way through the Town's municipal complex.

75. There is also potential access from the east via a paper street called Industrial Drive. The unimproved paper street would require approximately 1,050 feet of roadway to develop.

76. Additionally, there is recreational access from the Upland Parcel to the Coventry Greenway, which is a popular bike path.

77. The remainder of the property is zoned R-20 (Residential), requiring a minimum lot size of 20,000 square feet with 292 feet of road frontage on its southern edge abutting Reservoir Road,

and the Upland Parcel is suitable for development under a comprehensive permit pursuant to R.I. Gen. Laws § 45-53-1 *et seq*.

78. Collectively, the Upland Parcel features approximately 1,431 feet of prime water frontage along the Flat River Reservoir.

### Soscia's Development Plans

79. Soscia is experienced in real estate development.

80. In 2019 and 2020, at considerable expense to Soscia, Soscia engaged professionals to survey the Upland Parcel and complete freshwater wetland delineations.

81. The survey and delineations revealed significant portions of buildable land around the Pond. *See* **Exhibit 6** (Boyer Survey).

82. The State of Rhode Island has a comprehensive low- and moderate-income housing scheme under the Rhode Island Low- and Moderate-Income Housing Act (the "LMIHA"). *See generally* R.I. Gen. Laws § 45-53-1 *et seq*.

83. As of 2024, the Town of Coventry only had 5.06% low- or moderate-income housing, which is significantly below the State's mandated threshold of 10%.

84. The LMIHA requires the Town to promote development to satisfy the 10% threshold, and developers are given incentives such as density bonuses and increased zoning flexibility.

85. Recent legislative changes have allowed mobile and manufactured home units to be applied towards a municipality's low- and moderate-income housing unit stock.

86. Considering the housing shortage and the long waiting list for low-or moderate-income housing throughout Rhode Island, Soscia planned to create a unique waterfront manufactured home development using a 100% low- and moderate-income housing model.

87. To further this plan, Soscia collaborated with professional engineers to develop plans for a community comprised of approximately 500 two-bedroom mobile homes.

88. This development would feature a beach, boat launch, and boat slip ownership for each mobile home, and the concept would offer low-or moderate-income buyers amenities that are unavailable elsewhere in Rhode Island.

89. Access to and use of the Pond would be included for the low- and moderate-income community for recreational activities.

90. While Soscia is confident in the viability of this mobile home community concept, Soscia has also explored other development concepts for the valuable Upland Parcel.

91. The northwest section of the "Industrial 1" zone, located behind the Town Hall, is the only area adjacent to the Pond where the permitted use includes the storage, repair, and sale of boats.

92. This prime location is particularly suited for establishing a marina and boat dealership.

93. The marina would feature essential facilities such as a boat launch, fuel dock, winter storage, ample parking, and dockominiums.

94. Johnson's Pond, as the largest, privately owned recreational pond in Rhode Island, has the capacity to accommodate over 2,500 watercraft during peak recreational seasons.

95. Soscia had received interest from several prominent boat dealers in this marina concept.

96. Upon information and belief, the Defendants were aware of Soscia's development plans.

***Preparation for Lease End***

97. The Lease with the Town was due to terminate in 2024.

98. Before the Lease terminated, Soscia began planning a new structure for allocating waterfront rights around the Pond.

99. After acquiring the property, Soscia engaged Boyer Associates to develop a condominium plan for Johnson's Pond. *See* **Exhibit 7** (Condominium Plan).

100. This plan aimed to establish a "land only" condominium complex with water frontage units, similar to a dockominium, granting adjacent properties riparian rights.

101. Each condominium would confer upon purchasers all the rights Soscia owns between the flowage line of Johnson's Pond and the designated "Common Area" on the map.

102. Essentially, this plan would transform "waterview" homes adjacent to Johnson's Pond that have no natural rights to use the water into "waterfront" properties with rights to use the water.

103. The significance of a waterfront property on Johnson's Pond is reflected in the Town of Coventry's tax assessor land adjustment known as the "Lakefront Adjustment."

104. This factor is used to determine the market value differential between properties with "Lakefront" amenities and those without.

105. When assessing a "Lakefront" property, the tax assessor multiplies the typical neighborhood land value by the "Lakefront Adjustment" factor, which ranges from 1.5 to 3.35 times the baseline land value, depending on the location and use of Johnson's Pond.

106. **In 2023, the average additional assessment per "Lakefront" house lot was $158,136.15, resulting in a total added value of $94,565,415.12 to the tax rolls of Coventry**.

107. Simply stated, a home located adjacent to the Pond, with access and usage rights, is valued at $158,136.15 more than a home across the street, according to the Coventry Tax Assessor.

108. Moreover, in 2023, in anticipation of the Lease ending, Soscia created a comprehensive 27-page reference guide for property owners, builders, and contractors. *See* **Exhibit 8** (Permit Requirements).

109.    This guide was designed to facilitate the process of seeking and receiving permits or licenses from Soscia to build or maintain structures within the reservoir and the fees for such permits and licenses, should a water-adjacent owner choose to rent access and usage of the Pond, rather than buy a waterfront condominium outright.

110.    It covers the requirements for obtaining permits for various projects, including:

    a.    Installation, modification, or transfer of boat docks;

    b.    Bank stabilization construction (*e.g.*, vegetation, riprap, and seawalls);

    c.    Boat ramps; and

    d.    Any other structures, including excavation and fill within the flowage boundary of the Pond (247.8' above sea level).

### *Sale of Rights*

111.    In January of 2024, anticipating the termination of the Lease with the Town, Soscia sold certain rights within the Flat River Reservoir to 5 companies (collectively the "Holding Companies").

112.    The right to build and maintain structures was sold to "Structures at Johnson's Pond, LLC," with exclusions for mineral extraction and aquatic plant removal. *See* **Exhibit 9** (Structures at Johnson's Pond, LLC Deed).

113.    The right to control boating was sold to "Boating at Johnson's Pond, LLC," with similar exclusions. *See* **Exhibit 10** (Boating at Johnson's Pond, LLC Deed).

114.     The right to control access to the Pond from private property was sold to "Waterfront at Johnson's Pond, LLC," allowing exclusion or permission to access the Pond directly from private property. This sale excludes the right to build and maintain structures and the right to control boating. *See* **Exhibit 11** (Waterfront at Johnson's Pond, LLC Deed).

115. The right to control access from public property was sold to "Common Area at Johnson's Pond, LLC," allowing control over public access and recreation. This sale excludes the right to build and maintain structures and the right to control boating as well as the right to control access from private property. *See* **Exhibit 12** (Common Area at Johnson's Pond, LLC Deed).

116. The submerged land under the Pond was sold to "Land at Johnson's Pond, LLC." This sale transferred the fee simple land under the Pond, with reserved rights for mineral extraction, aquatic plant removal, and a flowage easement. Further, this sale excludes the right to build and maintain structures and the right to control boating as well as the right to control access from private and public property. *See* **Exhibit 13** (Land at Johnson's Pond, LLC Deed).

117. Following these transfers, Soscia retained exclusive rights to mineral extraction, aquatic plant removal, dam operation and maintenance, water level control, and 938 acres of flowage easements within the boundaries of Johnson's Pond.

### *The Taking*

118. Upon information and belief, before the Lease ended, the Town decided that it desired to take the Pond and the Upland Parcel (collectively the "Property") for its own use.

119. On June 14, 2023, GZA GeoEnvironmental, Inc. at the direction of Solicitor Angell, inspected the Dam on behalf of the Town.

120. That same month, the Town engaged Andolfo Appraisal Associates, Inc. (the "Appraiser") to conduct an appraisal of the Property, and the Appraiser inspected the Property on October 26, 2023.

### *The Executive Session*

121. On December 19, 2023, the Town Council held an executive session during its Town Council Meeting to discuss the planned condemnation (the "Executive Session").

122.   The Executive Session Minutes are publicly available on the Town of Coventry's website, and they have been available there since they were posted in March of 2024. *See* **Exhibit 14** (Executive                Session                Minutes);                *see                also* https://coventryri.civicweb.net/filepro/document/177077/12-19-23%20ES%20Minutes.docx.

123.   The heading for the relevant section of Executive Session Minutes states, "Executive or closed session pursuant [per] R.I. Gen. Laws § 42-46-5(a)(2) Litigation matters re *Soscia Holdings, LLC v. Town of Coventry* (KC-2020-0769)."

124.   The referenced case involves separate litigation between the Town and Soscia in connection with the Lease and has nothing to do with a condemnation.

125.   To the extent that these Executive Session Minutes were subject to any privilege or protection under the Open Meetings Act, such privilege or protection has been waived.

126.   The Executive Session was led by Town Solicitor Stephen J. Angell, Esq.

127.   Also present at the Executive Session were Council President Hillary Lima, Vice President Jamie LeBlanc, Town Council Members Jennifer Ludwig, Kim Shockley, and Jonathan Pascua, Town Manager Daniel Parrillo, and Town Clerk Joanne Amitrano.

128.   Angell began by explaining that in connection with "the Town taking over the Pond," the Town was conducting an appraisal.

129.   He explained that the Appraiser "has encountered some difficulties" because there were "multiple deeds for multiple parcels that list flowage."

130.   Angell also mentioned that there were prior transactions "with no acreage" and that the "legal description for the Property is deficient and the Lease is about imprecise as anything."

131.   Angell then went into a discussion about how much a condemnation would cost and how the Town would pay for it.

132.    As a solution, he proposed a tax increment financing ("TIF") District.

133.    The Executive Session Minutes state Angell "went on to talk about what the possible pool of money that could be collected from the abutters."

134.    "He said they would be looking to borrow about $10,000,000 in one form or another. They will talk further whether it is a bond or a loan. He went on to say it is probably a $1,500,000 a year in debt services between servicing a buy out and putting some capital money aside."

135.    Angell believed "Soscia can't afford to own the Pond," and that it was worth it to buy Soscia out for "not much more than [it] paid plus some appreciation costs."

136.    Next, Councilmember Shockley asked if the Town was purchasing all the Property that Soscia purchased in 2020, and Angell responded that the Town is evaluating this.

137.    Angell then explained that a bond was not possible for various reasons. He talked about debt service, and said that "a private lender would lend us money for this."

138.    Importantly, the Executive Session Minutes show that Angell explained a redevelopment authority was necessary for the taking. The Minutes make clear that Angell had been developing this concept for some time.

139.    "You need to apply for a redevelopment and have a redevelopment plan which is all laid out in the documents he has provide[d] to them. This is a necessary element to have a planner for this redevelopment with the TIF[] District."

140.    Angell also reiterated his view that there were "discrepancies in the deeds" and that the Town's experts would "definitely want to see a survey and some title work to reconcile the language in the deeds."

141.    At this point, "**<u>Vice President LeBlanc asked if councilmembers can be held liable</u>**."

142.    Angell said no, but then qualified that answer by explaining that "**you would be liable in an instance where the Council in his opinion was reckless by saying the hell with it and said let's just take the place by eminent domain and then we will fight about the price. That would be the type of reckless action that would expose the Council**." In the end, that is exactly what the Town did at Angell's direction.

143.    Relating to the timing of the taking, Angell suggested that "it is not favorable for Soscia if this Lease lapses."

144.    Then, "**Angell talked about the TIF[] District being an absolute critical piece so the 36,000 people of the Town are not obligated to pay for Johnson's Pond and only those who are indirect and direct abutters would pay**." He also explained "the betterment fee and how it ensures public access." This statement reveals that the Town knew this was not a taking for public purpose but would only benefit the Town and property owners on the Pond.

145.    "Manager Parrillo mentioned that it will not be the Town collecting this money it would be the Redevelopment Agency collecting the money."

146.    "President Lima asked if any of these paths are more flexible than others in terms of absorbing other situations benefitting from a Redevelopment Authority."

147.    "Solicitor Angell talked about repairs needed to the Dam. He said that **Soscia has no end game when it comes to generating revenue**."

148.    The Executive Session finished with discussion about the cost of the taking. "Councilmember Pascua asked [Angell]" about a "worst case scenario," and Angell said they were "**building in a margin for something over $3,000,000**." He elaborated that they were "[b]uilding in soft cost to get this done and seeding a fund to rehab some of these structures."

149.    "President Lima asked that the cushion amount not leave the room because th[e]n [sic] Soscia can plan."

150.    Finally, "**Angell said based on the economic analysis done that list of indirect and direct abutters won't be able to support more than [$3,000,000] on a rolling basis**."

151.    The Executive Session Minutes show that: (i) the Town did not know the extent of the Property that it planned to take; (ii) that the Town sought to take the Property through a redevelopment agency and finance the project using a TIF District, allocating costs to abutters of Johnson's Pond; (iii) that the Town set a predetermined budget of $3,000,000 annually for the taking based upon what neighbors of the Pond could afford to support; (iv) that the Town sought to transfer rights to Johnson's Pond from Soscia to the other abutters of the Pond, adding nearly $200,000 to each of their property values; and (v) that the Defendants all knew they would be subject to liability if proper procedures and legal safeguards were not exercised.

*Town Resolutions, Ordinances, and Other Action Before the Taking*

152.    On January 23, 2024, the Town Council adopted Resolution No. 2024-4, which affirmed the "need for a Coventry Redevelopment Agency and Appointing Members to the Coventry Redevelopment Agency." *See* **Exhibit 15** (Resolution No. 2024-4).

153.    Resolution No. 2024-4 was sponsored by Lima and Leblanc, and was approved as to form and substance by Angell.

154.    On February 15, 2025, the Town Council adopted Resolution No. 2024-7, which appointed the following members to the Coventry Redevelopment Agency: Robert Brennan, Harold B. Larson, Chris Schuler, Jim Tarro, and Caitlin Grenier.

155.    On March 26, 2024, Angell held a press conference about Johnson's Pond with WPRI 12.

156.    During this press conference, where members of the Town Council were present, he showed personal animus towards Soscia and its principals.

157.    Angell stated, "**He wanted $100 million dollars, and when that didn't work, he wanted $61 million dollars. I want to be an Olympic athlete. Let's see who gets lucky first**."

158.    Angell also proclaimed, "There's one reason and one reason only for someone to find themselves in an ownership position of this Dam, other than a governmental entity, and that is to put a gun to the head of this municipality to get them to pay some ransom price for it. **That's not going to happen that way**."

159.    The Lease terminated on March 31, 2024.

160.    A few days later on April 3, 2024, the Town Council hosted a workshop with the newly created Coventry Redevelopment Agency.

161.    The goal of the meeting was "to discuss the particulars of GZA engagement by the Agency for purpose of composing a redevelopment plan for the Johnson's Pond property."

162.    Before the passage of the Ordinance authorizing the condemnation, but requiring the Town to first attempt to purchase the Pond from Soscia, Angell presented Soscia with an offer to purchase the Property for $1,527,000.00 on April 29, 2024. *See* **Exhibit 16** (Offer to Purchase).

163.    The Offer to Purchase would have also required the release and waiver of all other claims between Plaintiffs and the Town, which included the pending dispute about obligations under the Lease.

164.    Plaintiffs did not respond to the Offer to Purchase.

165.    On May 2, 2024, the Town Council adopted Resolution No. 2024-37, "[m]aking plain the Town Council's intentions and commitment to acquire, maintain, and **redevelop** Flat River Reservoir ("Johnson's Pond"), its Dam, dam structures, and land to protect the environment,

to ensure public safety, and to provide recreational access to the public." *See* **Exhibit 17** (Resolution No. 2024-37).

166.    The Redevelopment Agency met on May 8, 2024 to discuss Resolution 2024-37 and its implementation ordinance set to go before the Town Council on May 9, 2024.

167.    On May 9, 2024, the Town Council performed the first reading of Ordinance No. 2024-03. *See* **Exhibit 18** (Ordinance No. 2024-03).

168.    Again, Ordinance No. 2024-03 stated that the purpose of the Ordinance was, *inter alia*, to "redevelop Johnson's Pond."

169.    The Ordinance authorized the Town to acquire "the Dam, dam structures, Pond, and associated property at Johnson's Pond, including any and all property, rights, and interested acquired by Soscia Holdings, LLC from the Quidnick Reservoir Company."

170.    The Ordinance was introduced by LeBlanc, endorsed by Angell, marked as passed by Lima, and approved by Parrillo.

171.    A Public Hearing was held on May 14, 2024, and then on May 21, 2024, "the Town Council voted 3 to 0 to give the Town Solicitor the authority to proceed in accordance with Ordinance 2024-03 to acquire Johnson's Pond by condemnation in accordance with the Ordinance." This vote lacked a quorum, which is 4 under the Town's Home Rule Charter.

172.    On June 20, 2024, the Town Council held a meeting and adopted Resolution No. 2024-42, allowing the condemnation of Johnson's Pond "to ensure public safety, and to provide recreational access to the public." *See* **Exhibit 19** (Resolution No. 2024-42).

173.    The references to "redevelopment" were removed from Resolution No. 2024-42.

174.    Resolution No. 2024-42 was sponsored by Lima and LeBlanc and approved as to form and substance by Angell.

175.   This Resolution sets forth: (i) the claimed purpose of the Taking (*i.e.*, "environmental protection and conservation, public safety, and public access to and recreational use of Johnson's Pond"); (ii) a description of the condemned property, which was all of Parcel II (the Pond), and only a portion of Parcel I (the Upland Parcel) as described in the Soscia Deed from 2020 (the "Condemned Property"); and (iii) the "just compensation" for the Taking, which was set at $157,000.00.

176.   During the meeting on the Resolution, Angell sarcastically remarked, this "**only nets them about $157,000. They should have taken the $1.5 million.**"

177.   Council President Lima laughed at this remark by Angell.

178.   **Angell then admitted that this Taking was "unprecedented," and that "there is no state statute that allows the Town to do this**."

179.   He claimed the taking would be under the Town's Home Rule Charter, but that they were also following "a state framework that does exist for other matters that are similar, but not identical."

180.   Angell plainly stated that the Town was in "**uncharted territory**."

181.   He also explained that DiPrete Engineering was chosen to do the land-use work because they had conducted prior surveys for the Property, and that if they did not go this route, they would have "needed a court order to do an entire survey, which would have taken months—and we don't have months."

182.   Notably, Angell stated that there were "**wild inconsistencies as to the estimated acreage in this area**."

183.   The Town filed a Miscellaneous Petition in Superior Court the next day on June 21, 2024, without naming or serving the Plaintiffs. *See* **Exhibit 20** (Miscellaneous Petition).

184.    No redevelopment plans were included with the Miscellaneous Petition.

185.    The Miscellaneous Petition instituted an *in rem* proceeding for the Town to conduct a "quick take" of the Condemned Property pursuant to a State law used for highway condemnations.

186.    An *ex parte* hearing was held on June 28, 2024 before Associate Justice Richard A. Licht.

187.    During the hearing, Angell represented the Town, and he stated the Taking was to benefit the public as a whole, and to allow others to use the Pond "on a **fee basis** for those who may not live in Coventry as a nonresident."

188.    Angell's statements to Superior Court Associate Justice Licht were not truthful, and Angell misled the Judge into believing the Taking was actually for public purposes and redevelopment. His misrepresentations constitute fraud upon the Court.

189.    The Superior Court approved a Condemnation Order, and it accepted a deposit of $157,000.00 into the Superior Court Registry as the estimated just compensation pursuant to the State highway statute (the "Taking"). *See* **Exhibit 21** (Condemnation Order) (authorizing the quick take and vesting title to the Condemned Property in the Town pursuant to R.I. Gen. Laws §§ 32-4-8 and 24-1-3).

190.    The Town submitted an Affidavit and Report from the Appraiser to justify its $157,000.00 estimate of just compensation, which is beyond inadequate. *See* **Exhibit 22** (Andolfo Appraisal).

191.    The Condemned Property and Soscia's planned development and sale of easements and condominiums (for water rights) and a low- and moderate-income housing development is worth significantly more than $157,000.00.

192.   By taking the Condemned Property, the Town bisected Parcel I and left the remainder of the Upland Parcel effectively landlocked without any means of practical access. This reduced the value of the remainder of Parcel I still owned by the Plaintiffs and caused substantial severance damages.

193.   The rough effect of the Taking is illustrated in the annotated survey attached hereto as **Exhibit 23** (Annotated Survey). This Annotated Survey is included for illustration purposes only at this point.

194.   As will be further elaborated *infra*, the facts of this case did not authorize the Town to utilize the State's recreational and highway statutes for this Taking, which was actually for redevelopment purposes.

195.   The precedent facts did not trigger the operative language in R.I. Gen. Laws §§ 32-4-8 and 24-1-3 to allow for the Taking.

196.   On June 28, 2024 and July 1, 2024, the Coventry Police Department issued "No Trespass Orders" to Plaintiffs and their principals despite the fact that the Town took the pond for "public purposes."

197.   The Second "No Trespass Order" threatened arrest for any trespassing on the Condemned Property, which was supposedly "public property."

198.   On July 1, 2024, Angell held a Q&A about the condemnation of Johnson's Pond.

199.   Explaining part of the reason for the Taking and why only $157,000.00 was paid into the Court Registry, Angell stated it was to "**send a message**" that "**if you're going to come here and you're going to misbehave, we're not going to tolerate it. Just that simple.**"

200.   Angell also described the vision for Johnson's Pond, which included a new "pavilion of some kind with restrooms with parking" and "an ability to have a contractor or someone else

come in as a vendor and rent kayaks and other things that can be utilized for recreational purposes on the Pond."

201.    He also explained that the Town took "what Soscia bought" from Quidnick in 2020.

202.    Receiving questions about what exactly the Town owns now, Angell stated, "Now that we own it, I will be looking to have the Council approve the funds to do a survey to make sure we get it right."

203.    The Plaintiffs are unaware of any subsequent survey that has been performed by the Town since the Taking.

204.    As a result, the Plaintiffs have never been made aware of precisely what portion of their Property, or if all of their Property was taken. The Town did not and could not condemn the easement rights transferred by Soscia in January 2024 to the entities described in Paragraphs 111-115 herein, as they were no longer owned by Soscia. Those entities are not referred to in the Town's Petition or in the Condemnation Order. In fact, the Condemnation Order at Paragraph 4 states, "[w]ithout prejudice to the rights of all persons having an interest in the Acquired Property[.]"

205.    Next, on November 12, 2024, the Town Council adopted Resolution No. 2024-98, "[t]ransferring to the Coventry Redevelopment Agency the redevelopment rights to the Pond[.]" *See* **Exhibit 24** (Resolution No. 2024-98).

206.    On February 26, 2025, at a meeting of the Redevelopment Agency, Angell made it clear that none of the abutting property owners have riparian rights to the Pond, which he claimed the Town now owns.

207.    On April 3, 2025, the Redevelopment Agency had a workshop with the Town Council.

208.    During this workshop, Councilman Pascua, who lives on Johnson's Pond, described the ability for the Town to create a marina on the Pond and make profit off of renting slips. Pascua lives on the pond. *See* **Exhibit 25** (Picture of Pascua on Johnson's Pond).

209.    Pascua stated that this would turn the Pond into a "**profit machine**" for the Town.

210.    Upon information and belief, this statement by Pascua appropriately summarizes the Defendants' intent in the condemnation of Johnson's Pond, which at all times was for redevelopment purposes, and to benefit the Town, the Councilmembers, Angell, and their supporters living around the Pond.

211.    Upon information and belief, Angell and Tim Eskey of Moses Ryan have received over $428,000 in legal fees from the Town, and they would receive hundreds of thousands of additional fees in the future working on the Town's redevelopment plans for the Pond and for condemnation litigation.

212.    Nonetheless, the Town unlawfully took Johnson's Pond for pretextual reasons, utilizing procedures designed for highways.

213.    Behind closed doors, as exemplified by the Executive Session, the Town, through the Town Council and Angell, was quietly conspiring to develop a comprehensive plan to take control of Johnson's Pond for the purpose of redevelopment and economic gain for the Town, themselves, and the property owners on the Pond.

214.    The Defendants later changed the public narrative to focus on conservation and recreation, only to return to the original economic redevelopment agenda after the Taking was complete.

215.    Aside from the unconstitutionality of this Taking, the $157,000.00 is insufficient compensation for the Property and was reached by deducting $3.585 million for alleged future repairs and future improvements to the Dam, representing a clear violation of the Just

Compensation Clause considering the Property is worth substantially more than that amount. The Town's reduction of the value based upon speculated future maintenance and improvements is improper and in of itself a clear violation of the Plaintiffs' right to Just Compensation.

216. To date, the Town has not officially completed the subdivision of Parcel I and the Defendants do not even know what land they took from Plaintiffs.

### *Erroneous Valuation of the Property*

217. In the unlikely event the Taking is upheld, the Plaintiffs have engaged an expert appraiser to conduct a valuation of the Property to assist the Court with determining the amount of just compensation due to Plaintiffs.

218. While Plaintiffs will expound on these reasons when appropriate, the appraisal relied upon the Town in determining the amount of just compensation is erroneous for the following reasons.

219. The Town and the Appraiser were unaware of what exactly they were taking.

220. The Town admitted there were uncertainties in the estimated acreage.

221. The Town failed to conduct a property survey in its rush to take the Pond.

222. Instead, the Town used reports from DiPrete Engineering, which it knew were not complete as they concluded the acreage of the Pond was only 413 acres—less than half of its known size.

223. Angell was fully aware that an incorrect acreage had been given to the Appraiser and intentionally led the Appraiser to arrive at the lowest value possible by engaging GZA and instructing them to generate a "dam study" which erroneously concluded that future repairs and future improvements for the Dam would total $3.585 million.

224.    Nonetheless, Angell falsely claimed at the Q&A on July 1, 2024 that the acreage had been determined by reference to the Soscia Deed.

225.    The Soscia Deed includes rights deriving from over 100 deeds.

226.    The Town did not conduct a title search or survey to trace and confirm the rights in the Soscia Deed in order to determine what it was taking.

227.    Upon information and belief, the Defendants all knew that there were issues with determining the bounds of the Condemned Property.

228.    Angell publicly gloated about the fact that the Town acquired the Condemned Property for only $157,000.00.

229.    Angell taunted the Plaintiffs in public and indicated that the Taking was meant to "send a message to them."

230.    Accordingly, the Defendants bypassed using qualified experts, such as a surveyor or title expert, to determine what exactly they would be taking form Plaintiffs, as the Defendants deemed this unimportant.

231.    Additionally, the Defendants knew that the Plaintiffs owned flowage easement rights around the Pond.

232.    The flowage easements were mentioned during the Executive Session and cited as one of the challenges of valuing the Condemned Property.

233.    Nonetheless, the Appraiser did not value the flowage easements or even mention them in the Report submitted to the Court.

234.    The Appraiser also failed to consider the value of the Pond or its associated water rights.

235.    While the Appraiser acknowledged the recreational use of the Pond, he did not assess the Pond as a water resource.

236.    Instead, the Appraiser based his Report on the assumption that the Dam and the Pond were absent.

237.    The Appraiser hypothesized a development of 66 condominium units.

238.    Thereafter, the Appraiser proceeded to make a $3,585,000.00 deduction from the appraised value for certain repairs to the Dam based upon GZA's inflated report.

239.    The deduction for the Dam repairs was improper, arbitrary, erroneous, and in bad faith because the Town itself failed to maintain the Dam during the Lease. Therefore, any repairs for the Dam should be borne by the Town and not Soscia.

240.    DiPrete Engineering, who was relied upon by the Appraiser, failed to consider development potential for about half of the Condemned Property.

241.    The Appraiser did not value severance damages for the approximately 69 acres remaining of Parcel I, which were negatively impacted by the Taking and essentially landlocked.

242.    The Appraiser further reduced the value of the Condemned Property by $866,000.00 to improve an already improved road running behind the Town Hall to the Condemned Property.

243.    These are only examples of some of the flaws of the Report used to justify the $157,000.00 "estimate of the Town."

244.    Plaintiffs will elaborate and substantiate these allegations with expert evidence.

***Additional Facts Surrounding the Unlawful Taking Supporting § 1983 Liability***

245.    Beyond the unconstitutional Taking and insufficient estimation of just compensation, the Defendants engaged in a multi-year pattern of conduct that supports holding them liable under § 1983.

*Inquiry with Planning and Zoning Office*

246.    In March 2020, Greg Soscia and Doug Soscia visited the Coventry Planning and Zoning Office to inquire about permits required to grade land within the Industrial zone.

247.    Present in the office were Kerri Karwoski from the Zoning Department and Russell Crossman ("Russell"), the Interim Director of Planning and Development, who has since passed away.

248.    Upon entering, Kerri Karwoski ("Kerri") greeted Greg and Doug Soscia.

249.    When Greg asked about the necessary permits, Kerri appeared uncertain.

250.    The conversation proceeded from there as follows:

   a.  Russell: (from his office) "Soil erosion and sediment control."

   b.  Kerri: "Is that all they need?"

   c.  Russell: "Yeah."

   d.  Kerri: "It's Soscia."

   e.  Russell: "Which Soscia?"

   f.  Kerri: "Greg."

   g.  Russell: "Denied."

   h.  Greg: "What else is new, Russ?"

   i.  Russell: "You better get used to it."

251.    Russell then invited Greg and Doug Soscia into his office, where the conversation continued.

   a.  Doug: "Better get used to what, denied?"

   b.  Russell: "Yes."

   c.  Russell: "How did the meeting go with Ed?" (Ed is Warzycha)

   d.  Greg: "You tell us."

    e.  Russell: "I don't know, I just heard about it today. When did you meet?"

    f.  Greg: "Yesterday."

    g.  Russell: "Ok, I'm not that far behind."

    h.  Greg: "How did it go?"

    i.  Russell: Laughing.

252.  Russell later admitted that although this was a routine zoning inquiry, because the Soscias were involved he would need to involve the Town Solicitor before making any decisions.

253.  This clear act of personal bias was based upon the identity of the Soscias and animosity towards them and not upon any legal standard.

254.  This was one of the first of many acts of the Town targeting Soscia for unequal and arbitrary treatment.

It is clear, the Town had decided to utilize its governmental authority to interfere with Soscia and its development plans immediately after buying the Property.

*The Zoning Certificate*

255.  For example, just weeks later in April of 2020, the Town improperly embedded private Lease restrictions in a Zoning Certificate issued to Soscia by mail. *See* **Exhibit 26** (Zoning Certificate).

256.  The Zoning Certificate attempted to embed private obligations between the Town and Soscia into a public land use document, which must be issued pursuant to R.I. Gen. Laws § 45-24-54 as a ministerial act by the Zoning Officer and limited to compliance with the generally applicable Zoning Ordinance.

257.  Including provisions from the Lease in the Zoning Certificate was improper by the Town and furthered the Town's scheme to gain control of the Property by limiting its use.

258.    Additionally, the Zoning Certificate contradicted terms in the Lease.

259.    By issuing the Zoning Certificate, the Town misrepresented the legal status of the Property to third parties such as lenders, insurers, and prospective buyers who rely upon zoning certificates to assess possible uses of the Property, its value and development possibilities.

260.    The issuance of the Zoning Certificate with embedded restrictions from the Lease—which is now expired—furthered the Defendants' scheme to interfere with Plaintiffs' rights under the color of law.

*Town Conspiracy and Favoritism with Private Developer*

261.    In February of 2021, a former Town Engineer, Bruce Hagerman, raised public concerns about a proposed 62-unit subdivision adjacent to the Pond.

262.    The developer of the adjacent parcel, John Assalone (the "Developer"), sought to discharge stormwater into the Pond without Soscia's permission.

263.    The Town's subdivision regulations prohibit stormwater discharge outside of a property's boundary.

264.    The Developer had applied for a waiver of this provision.

265.    In response to the waiver request, Hagerman opined that the Developer required permission from Soscia to support his waiver request to dump stormwater into the Pond.

266.    On March 4, 2021, in an email chain between the Developer, his attorneys, and his engineer, the Developer's attorney described a Zoom meeting that the attorney had with the Town's solicitor that morning. *See* **Exhibit 27** (March 2021 Email).

267.    The March 2021 Email explained that "[t]he Town will abide by the RI DEM approval on this project and not follow the 'suggestions' of Bruce Hagerman with regard to his

interpretations of the lack of clarity in the RI Dem Regs or the necessity of obtaining approval of the abutting land owners."

268.   Instead, the March 2021 Email explained that the Developer should have a "RI DEM approval in hand" before returning to the Town for approval.

269.   This March 2021 Email represents a conspiracy between the Town and the Developer to interfere with Soscia's rights and pollute the Pond for their own gain at Soscia's expense, bypassing local laws surreptitiously all outside of the public forum.

*Tiogue Lake*

270.   In 2005 Quidnick sold **some** rights to Tiogue Lake to the Town of Coventry. *See* **Exhibit 28** (2005 Tiogue Lake Deed).

271.   In 2020, Soscia bought all rights to the Flat River Reservoir and Johnson's Pond, and "all flowage rights, dams, flumes, raceways, and other apparatus of equipment used in connection therewith." *See* **Ex. 5** (Soscia Deed).

272.   The Soscia Deed included all rights to Tiogue Lake not already deeded to the Town in 2005, which included certain rights to the Tiogue Dam Gatehouse and underground pipes associated with such.

273.   On July 22, 2021, Quidnick deeded these rights that it previously deeded to Soscia, to the Town of Coventry, at the direction of the Town, through a "Corrective Deed." *See* **Exhibit 29** (2021 Corrective Deed).

274.   The Corrective Deed was intentionally fraudulent and attempted to convert and convey rights not owned by the Town, as they were owned by Soscia.

275.    Since the gatehouse and associated rights were not included in the 2005 Tiogue Lake Deed and reserved by Quidnick, they were transferred to Soscia in 2020, and the Town had no ability to convey these rights in 2021.

276.    Nonetheless, the Town purports to be the record owner of certain rights in Tiogue Lake and has used the 2021 Corrective Deed in public meetings and statements to interfere with Soscia's Property and constitutional rights, only to further their plan to take the Pond.

277.    For example, during the Town Council Meeting on the 2021 Corrective Deed, former Vice President Ludwig "clarified for the Public that we do already own the Rights to the water on either side of Rt. 3, and the **motion is to accept a deed for pieces that were not specifically defined in what we consider the appropriate manner on the original deed**."

278.    Ludwig saw the 2021 Corrective Deed "as an opportunity for lessons learned from Johnson's Pond and to have an opportunity to protect the residents."

279.    The 2021 Corrective Deed is another part of the Defendants' scheme to interfere with the Plaintiffs' rights under the color of law.

*Discriminatory Treatment by Police and Fire Departments*

280.    During an August 29, 2021 protest at a local plaza owned by a member of Soscia Holdings, Bruce Soscia, the Town Solicitor at the time directed the police not to remove protestors from the private property despite being asked to do so by Bruce Soscia.

281.    The Fire Chief, Frank Brown ("Chief Brown") was one of the protestors.

282.    Chief Brown is now on the Town Council, and he has previously spread false claims that low water levels in the Pond hindered his ability to fight a fire.

283.    On May 30, 2023, the Police Department refused to trespass Chief Brown after he suggested that it was time to bring a Molotov cocktail to one of the Soscia's family homes.

*Pascua and Angell Enter the Town Council Through a Quid Pro Quo*

284.    On the day Pascua was sworn in, November 28, 2022, Councilors Leblanc, Lima, and Pascua violated the Open Meetings Act (OMA) by privately orchestrating the appointment of Stephen Angell as the new Town Solicitor without notice, public discussion, or the involvement of Councilmembers Shockley and Ludwig.

285.    Neither Shockley nor Ludwig had heard of Angell prior to the meeting, his rates were not disclosed, and he was never interviewed by the full Council.

286.    These discussions occurred before Pascua was formally sworn in but after his election, at which point he was already subject to the requirements of the OMA.

287.    An anonymous complaint led to a formal finding by the Rhode Island Attorney General that the Council had violated the OMA. *See* **Exhibit 30** (OMA Decision).

288.    The Attorney General rejected the Council's argument that Pascua's pre-swearing participation excused the violation, concluding that once elected, members-elect are subject to the OMA and cannot privately discuss public business.

289.    The Attorney General found that the appointment of Angell was improperly pre-decided by a quorum outside of a noticed public meeting, and that minimal discussion took place during the public session where Angell's appointment was finalized.

290.    The Attorney General further found that injunctive relief was appropriate, ordering the Council to revote on the appointment of the Town Solicitor and Interim Town Manager at properly noticed meetings.

291.    Upon information and belief, Angell and Pascua entered the Town Council through a quid pro quo, self-dealing, and promises of favorable treatment for each other's interests and agendas.

292.    Through Angell and Pascua entering the Town Council, Lima obtained the position of Council President, Leblanc became Vice President, Angell profited through his appointment as Town Solicitor, and Pascua secured their support along with Angell's legal assistance to carry out his plan to take control of Johnson's Pond.

293.    Upon information and belief, Angell received at least $146,000 for his work on Johnson's Pond, and Moses Ryan, the firm that assisted Angell with the condemnation, received at least $282,000.

294.    Subsequently on January 23, 2023, Pascua appointed the President of the Johnson's Pond Civic Association, Marc Lemoi, to the Pawtuxet River Authority.

295.    Pascua lives on the pond and is financially benefitted by the condemnation.

296.    Since taking office, Pascua has maintained multiple non-permitted structures, specifically docks, extending from the edge of his property into the Pond.

297.    The placement of these structures unlawfully occupied a defined portion of what was, at the time, the Town's "Leasehold Estate" and is currently part of its "Freehold Estate."

298.    In addition to the structures themselves, Pascua personally stores various watercraft adjacent to them, effectively excluding the Town of Coventry and its residents from engaging in recreational activities such as fishing, boating, and ice skating in that area. Coventry's Zoning Official has refused to enforce these zoning violations by Pascua.

299.    Pascua derives a direct financial benefit from maintaining these illegal structures.

300.    He avoids the fuel, maintenance, and wear and tear expenses associated with transporting his boats, and he incurs no costs for public boat ramp access or private boat storage.

301.    By refusing to seek proper permitting, he also avoids the associated permitting and surveying fees.

302.    If Pascua were to apply for and be denied a permit, he would face both the loss of use and the financial burden of removing and disposing of the unauthorized structures.

303.    On May 9, 2023, Pascua, the Council, and the Solicitor drafted and proposed through the State legislature a tailor made bill that "grandfathers" Pascua's docks.

304.    The Council supported the bill through "Resolution No. 2023-30." Even though "Councilmember Ludwig asked if there could be a conflict of interest for a council member to vote on this resolution," Pascua proceeded to vote in support of this Bill despite the fact he would financially benefit from its passage.

305.    Soscia has been silenced and prevented from participating in public discussions over Johnson's Pond, and in February of 2023 was denied the ability to speak by Lima and Angell at a Town Council Meeting about access to public records.

306.    Upon information and belief, the Defendants have conspired with each other in their Individual and Official Capacities to violate the Plaintiffs' constitutional rights under the color of law.

## Count I

### Takings Clause – Fifth and Fourteenth Amendments of the United States Constitution

307.    Plaintiffs repeat the foregoing allegations in this Complaint as if they were each expressly set forth herein.

308.    Plaintiffs are the owners of the Property and all rights associated therewith by virtue of the Soscia Deed, Water Rights Agreement, and subsequent deeds to the Holding Companies in 2024.

309.    Under the Fifth and Fourteenth Amendments of the United States Constitution, private property shall not be taken for public use without just compensation (the "Takings Clause").

310.    The Takings Clause is self-executing, and a violation of the Takings Clause requires either (i) return of the Property to the property owner for a taking that does not satisfy the public use provision of the Takings Clause, or (ii) payment of just compensation to the property owner.

311.    The Town's taking of Johnson's Pond violates the public use provision of the Takings Clause.

312.    While the Town may take property for redevelopment purposes under *Kelo v. New London*, 545 U.S. 469 (2005), the Town did not take this Property under the legal procedures and requirements for a redevelopment taking, as described by the United States Supreme Court and implemented by the State of Rhode Island.

313.    The Town officially declared in its Petition that the "public use" was for "environmental protection and conservation, public safety, and public access to and recreational use of Johnson's Pond."

314.    However, this declaration of "public use" was merely pretextual.

315.    The Town took the Condemned Property to turn the Pond into a "profit machine" for the Town and thereby violating the requirements set forth in *Kelo* that private property cannot be taken to give to another party. Here, the Town took the Property for the Town itself, not for third parties to develop to benefit the public interest.

316.    There was no redevelopment plan submitted by the Town.

317.    The Taking was in bad faith.

318.    The State of Rhode Island has legal procedures in place for an economic redevelopment taking in accordance with *Kelo*.

319.    Rhode Island's economic redevelopment taking procedures as set forth in R.I. Gen. Laws § 45-32-1 *et seq*. and § 45-64.12-1 *et seq*. limit economic redevelopment takings, provide

procedural safeguards for such, and mandate greater compensation (150% of fair market value) for property that is taken for economic redevelopment.

320.    Because the Town realized that the proposed taking did not qualify for a redevelopment taking under Rhode Island law, which implements *Kelo* and affords assurances and rights to property owners, the Town conjured a pretextual "public use" to shoehorn the Taking into other State legal procedures for condemning property.

321.    By taking the Condemned Property for a pretextual "public use" of public safety and recreational use, utilizing an inapplicable "quick take" statute for public highways, the Town violated the public use provision of the Takings Clause of the United States Constitution, and it has engaged in a redevelopment taking in violation of *Kelo* and the Takings Clause.

322.    Further, the planned redevelopment use is not even a public use, as the Town intends to fund the Taking through a TIF District where the private property owners around the Pond pay for the Taking through increased tax revenue, and the private abutters are the ones who benefit from the Taking of the Condemned Property.

323.    The effect of the Taking of the Pond from Plaintiffs is to directly transfer benefits to the Pond from Soscia to the abutters of Johnson's Pond, which is the type of taking that is prohibited by the United States Supreme Court and the Takings Clause.

324.    Plaintiffs are unaware of any increase in public access to the Pond.

325.    Because the Taking of the Condemned Property was not for a public use, the Taking violates the Fifth and Fourteenth Amendment and must be invalidated as unconstitutional.

326.    Even if the Taking of the Condemned Property were upheld, the Town has failed to pay the Plaintiffs just compensation.

327.    The $157,000.00 deposited into the Court Registry is insufficient.

328.    Upon information and belief, the Property is worth substantially more than $157,000 and it is subject to a 150% compensation award under applicable State law.

329.    It is unclear what the Town has even taken from Plaintiffs, as the description of the Condemned Property was deficient, and the Plaintiffs have not been provided adequate notice of the condemnation.

330.    With respect to the portion of Parcel I still owned by Plaintiffs, Plaintiffs have suffered severance damages due to the fact that the remainder of Parcel I is considerably less valuable due to a loss of its access and appurtenances.

331.    The Town has failed to pay the *pro tanto* to the Plaintiffs as is required under the United States Constitution, and thus, the Plaintiffs have not received any compensation for the Taking of their Property.

**WHEREFORE**, Plaintiffs respectfully requests that this Court enter an order as follows:

a.    An award of just compensation (subject to 150% multiplier), including attorney's and expert fees, costs, and interest;

b.    That Defendants have not satisfied the legal requirements of the Takings Clause, and that the Taking be invalidated, along with an award of damages to the Plaintiffs to compensate them for the unlawful Taking, including attorney's fees, expert fees, costs, and interest; and/or

**c.**    That the Taking otherwise be invalidated, as the Town did not provide an adequate description of the property it took from Plaintiffs, and in fact, the Town Solicitor Angell admitted a survey should be done beforehand "but we don't have time."

## Count II

### 42 U.S.C. § 1983 – Procedural Due Process –
### 5th and 14th Amendments of the United States Constitution

332.    Plaintiffs repeat the foregoing allegations in this Complaint as if they were each expressly set forth herein.

333.     At all relevant times, Plaintiffs had a protected property interest in the Property.

334.    The Defendants, acting under the color of law, deprived Plaintiffs of their Property without constitutionally adequate process.

335.    The deprivation of Plaintiffs' Property was significant, and Plaintiffs have been deprived of the value and enjoyment of the Property and ability to earn income therefrom.

336.    Defendants intentionally and with malice violated Plaintiffs' due process rights by taking the Condemned Property without exercising proper procedures, and at no time did Defendants offer Plaintiff an opportunity to be heard on the deprivation of their Property in a meaningful time or in a meaningful manner.

337.    The Defendants prejudged the decision to condemn the Pond.

338.    Several of the Defendants, including Angell, held personal animosity or bias or prejudice against Plaintiffs by reason of preconceived opinions of the individual principals of the Plaintiffs, and this personal animosity was the basis for the violation of Plaintiffs rights.

339.    Several of the Defendants were biased and held personal financial or pecuniary interests in the condemnation of the Pond.

340.    Pascua owns a house on the Pond.

341.    Pascua voted on Resolution No. 2024-37, which set the framework and goals for the condemnation of the Pond.

342.    Pascua later recused himself from voting by declaring a "disclosure of interest."

343. The fact that Pascua, an admittedly biased decision-maker, voted on Resolution No. 2024-37 in violation of R.I. Gen. Laws §§ 36-14-5(a), 36-14-5(d), 36-14-6, and 36-14-7(a) also violated Plaintiffs' rights under the Due Process Clause.

344. Pascua is now under investigation by the Rhode Island Ethics Commission, which found that there was probable cause to proceed with a full investigation.

345. Angell and Moses Ryan received approximately $428,000 in legal fees, and Angell had an interest in the redevelopment plan, which would result in more fees paid to him, along with the condemnation litigation fees.

346. The Defendants failed to properly give Plaintiffs notice of what they were taking, and they failed to follow their own Ordinance authorizing the Taking at the local level.

347. For example, Ordinance No. 2024-03 stated that the Town "shall" acquire by condemnation "any and all property, rights, and interests acquired by Soscia Holdings, LLC from the Quidnick Reservoir Company."

348. When the Defendants later took the Condemned Property, they took only a portion of the rights owned by Plaintiffs, as they only acquired an indefinite portion of Parcel I.

349. Defendants also ignored the fact that Soscia had severed and transferred many of the rights allegedly subject to the taking to the Holding Companies.

350. The Defendants' haphazard, vague, and ambiguous description of the Condemned Property as that which was acquired by Soscia Holdings, LLC—in 2020, years before the Taking—was an imprecise and insufficient description of the Condemned Property, which should have been surveyed and described as it existed on the date of the Taking in an adequate manner to give the Plaintiffs' notice of what was taken. As a result, the Condemnation Order should be vacated.

351.    The Defendants failed to satisfy conditions precedent to the Taking in Ordinance No. 2024-03.

352.    The Defendants failed to properly take the easements and rights Soscia transferred to the entities set forth in Paragraphs 111 to 116, nor were they referred to whatsoever in the Condemnation Order. The Taking of all land and rights Soscia purchased from Quidnick in 2020 could not include rights it no longer owned.

353.    While Ordinance No. 2024-03 only authorized the Taking "if the Town's efforts to purchase the Pond are of no avail," the Town did not make any offers to purchase the Condemned Property after Ordinance No. 2024-03 was passed.

354.    The only offer made to purchase the Property was for $1,527,000.00 before Ordinance No. 2024-03 was passed, and this offer was illegitimate because it was conditioned upon unrelated waivers and releases of claims.

355.    The Defendants' failure to follow its own Ordinance to effectuate the Taking violated Plaintiffs' rights under the Due Process Clause.

356.    Pascua also intentionally voted on Ordinance No. 2024-03, clearly knowing it was a violation of the regulations of the Rhode Island Ethics Commission, and representing a clear conflict of interest and violation of the Due Process Clause's guarantee that decisions must be made by unbiased decision-makers.

357.    Resolution No. 2024-42 was passed with a 3-0 vote, which is short of a quorum.

358.    The Town's own Home Rule Charter requires 4 members for a quorum, and 4 affirmative votes to create binding action. As a result, the Ordinance was not approved, and it is invalid. Therefore, the condemnation is also invalid and illegal.

359.    Resolution No. 2024-42 authorized the Taking for $157,000.00.

360.    Resolution No. 2024-42 is invalid *ab initio* and also violates the Due Process Clause.

361.    The Town officially represented to the Plaintiffs, the Court, and to the public that the Taking was for "environmental protection and conservation, public safety, and public access to and recreational use of Johnson's Pond," but behind closed doors the Town was meticulously planning to turn the Pond into a "profit machine," and it always intended to take the Pond for redevelopment purposes, funding such through taxes paid by abutters on the Pond.

362.    This procedural sleight of hand by the Defendants violates the Due Process Clause.

363.    The Defendants unlawfully used a "quick take" procedure to obtain the Condemned Property under R.I. Gen. Laws § 24-1-1 *et seq*. and R.I. Gen. Laws § 32-4-1 *et seq*.

364.    There is no independent ability for the Town to utilize § 24-1-1 *et seq*. for the Taking, which is an expedited procedure utilized for public highway takings.

365.    As a result, the Town invoked § 32-4-8 as authority for the Taking.

366.    Section 32-4-8 only allows local units to acquire lands for conservation and recreation purposes where "the director [of administration] approves the acquisition of lands by a local unit with state assistance." § 32-4-8.

367.    In this case, there was no approval from the Director of Administration of the condemnation or assistance from the State with such.

368.    Because a condition precedent was not met under § 32-4-8, the Town had no legal authority to utilize the quick take procedure under § 24-1-1 *et seq*.

369.    Further, the Town's Home Rule Charter requires that all eminent domain proceedings and other powers exercised by the Town be in the manner prescribed by State law.

370.    Because the Taking of the Condemned Property unlawfully utilized a quick take procedure, the Taking violates the Due Process Clause and the Town's Charter.

371.    Redevelopment takings in Rhode Island, to the extent permitted, are subject to significant procedural safeguards including pre-take notice, public hearings before the Town Council, an opportunity to contest the validity of the condemnation, and an adoption of a detailed redevelopment plan prior to the taking. *See, e.g.*, R.I. Gen. Laws § 45-32-1 *et seq.* and R.I. Gen. Laws § 42-64.12-1 *et seq.*

372.    Redevelopment takings also require a *pro tanto* disbursement, allowing immediate compensation for the taking.

373.    The State of Rhode Island and Rhode Island Supreme Court have limited economic redevelopment takings following *Kelo*.

374.    This Taking also does not qualify as a valid economic redevelopment taking, even if the Town had sought to follow appropriate procedures for such.

375.    The condemnation of Johnson's Pond by the Defendants was without due process of law, and the Individual Defendants knew, and particularly Angell, that the legal procedures by the Town implemented were improper and illegal.

376.    The Defendants knew they were in "uncharted territory."

377.    The Individual and Official Defendants were aware that reckless action would expose them to liability.

378.    Each of the Individual and Official Defendants, from an objective standpoint, should have known that their conduct was unlawful, and Plaintiffs' constitutional right not to be deprived of their Property without procedural due process was clearly established at the time of the violation.

379.    Angell's statements pre-and-post taking show an animus to the Defendants and a reckless, callous, and outrageous indifference to the federal protected rights of Plaintiffs, with evil intent.

380.    The Individual and Official Defendants shared this reckless or callous indifference or evil intent.

381.    The Individual and Official Defendants voted and supported Resolutions and Ordinances that enabled the unlawful Taking.

382.    The Defendants, along with any reasonable public official, should have understood, based upon Angell's own statements to them during the Executive Session, that the failure to follow well-established laws on eminent domain proceedings contravened Plaintiffs' procedural due process rights, and that the Defendants could be held personally liable.

383.    Plaintiffs have been injured as a result of the Defendants' actions and/or inactions.

**WHEREFORE**, Plaintiffs respectfully requests that this Court enter an order as follows:

a.  That the Defendants are jointly and severally liable (under § 1985) to Plaintiffs for conspiring and violating their rights under § 1983 and the Fifth and Fourteenth Amendment of the United States Constitution;

b.  An award to Plaintiffs of damages in an amount to make Plaintiffs whole for Defendants' constitutional violations;

c.  An award of equitable or injunctive relief invalidating the condemnation and returning the Condemned Property to the Plaintiffs;

d.  An award to Plaintiffs of any and all attorneys' fees, expert fees, costs, and other expenses incurred by Plaintiffs under 28 U.S.C. § 1988;

e.  A determination that the Taking by the Town was unlawful and defective in several ways as set forth above and should be vacated and returned to Soscia, and that Soscia be awarded damages, attorneys fees, and costs for same;

f.  An award of punitive damages against Defendants; and/or

g.  Any other relief that the Court deems fair, equitable, and just.

### Count III

***42 U.S.C. § 1983 – Substantive Due Process –***
***5th and 14th Amendments of the United States Constitution***

384.  Plaintiffs repeat the foregoing allegations in this Complaint as if they were each expressly set forth herein.

385.  For the reasons as set forth above, the Defendants' aforementioned actions and/or inactions violated Plaintiffs' substantive due process rights under the United States Constitution.

386.  Defendants unlawfully deprived Plaintiffs of their Property, in which they had a protected property interest.

387.  Defendants' actions and/or inactions were so egregious as to shock the conscious.

388.  Defendants' abused their governmental power when they decided to take the Condemned Property to create a "profit machine" for the Town and their benefit.

389.  The actual purpose of the Taking had no rational connection to the official purpose of the Taking.

390.  Defendants' actions and/or inactions were arbitrary, capricious, and outrageous and motivated by animosity, bias, and self-interest.

391.  Plaintiff has been injured as a result of Defendants' actions and/or inactions.

**WHEREFORE**, Plaintiffs respectfully requests that this Court enter an order as follows:

a. That the Defendants are jointly and severally liable as members of the Town Council and individually liable (under § 1985) to Plaintiffs for conspiring and violating their rights under § 1983 and the Fifth and Fourteenth Amendment of the United States Constitution;

b. An award to Plaintiffs of damages in an amount to make Plaintiffs whole for Defendants' constitutional violations;

c. An award of equitable or injunctive relief invalidating the condemnation and returning the Condemned Property to the Plaintiffs;

d. An award to Plaintiffs of any and all attorneys' fees, expert fees, costs, and other expenses incurred by Plaintiffs under 28 U.S.C. § 1988;

e. A determination that the Taking by the Town was unlawful and defective in several ways as set forth above and should be vacated and returned to Soscia, and that Soscia be awarded damages, attorneys fees, and costs for same;

f. An award of punitive damages against Defendants; and/or

g. Any other relief that the Court deems fair, equitable, and just.

## Count IV

### *42 U.S.C. § 1983 – Takings Clause –*
### *5th and 14th Amendments of the United States Constitution*

392. Plaintiffs repeat the foregoing allegations in this Complaint as if they were each expressly set forth herein.

393. For the same reasons as set forth above, Plaintiffs' claim pursuant to the Takings Clause is also actionable under 42 U.S.C. § 1983.

394. By taking the Condemned Property in violation of the public use provision of the Takings Clause and without providing just compensation to Plaintiffs, Defendants have deprived the

Plaintiffs of their constitutional rights under color of law, and as a result, are liable for damages sustained by the Plaintiffs.

395.    The Defendants conspired to violate the constitutional rights of the Plaintiffs and are jointly and severally liable both as members of the Town Council and individually for the Takings Clause violation under 42 U.S.C. § 1985.

396.    The Defendants are also liable for Plaintiffs' attorneys' and expert fees & costs incurred to vindicate their constitutional rights under 42 U.S.C. § 1988.

**WHEREFORE**, Plaintiffs respectfully requests that this Court enter an order as follows:

a.    That the Defendants are jointly and severally liable as Town Council members and individually (under § 1985) to Plaintiffs for conspiring and violating their rights under § 1983 and the Fifth and Fourteenth Amendment of the United States Constitution;

b.    An award to Plaintiffs of just compensation and damages in an amount to make Plaintiffs whole for Defendants' constitutional violations;

c.    Alternatively, an award of equitable or injunctive relief invalidating the condemnation and returning the Condemned Property to the Plaintiffs;

d.    An award to Plaintiffs of any and all attorneys' fees, expert fees, costs, and other expenses incurred by Plaintiffs under 28 U.S.C. § 1988;

e.    A determination that the Taking by the Town was unlawful and defective in several ways as set forth above and should be vacated and returned to Soscia, and that Soscia be awarded damages, attorneys fees, and costs for same;

f.    An award of punitive damages against Defendants; and/or

g.    Any other relief that the Court deems fair, equitable, and just.

## Count V

### *Declaratory Judgment Act – 28 U.S.C. § 2201 and 28 U.S.C. § 2202*

397.    Plaintiffs repeat the foregoing allegations in this Complaint as if they were each expressly set forth herein.

398.    The Federal Declaratory Judgment Act allows the Court to declare the rights and other legal relations of the Plaintiffs and Defendants in a case of actual controversy.

399.    This is a case of actual controversy.

400.    Based upon the foregoing allegations, Plaintiffs respectfully request a declaratory judgment as follows:

a.    That the Taking violates the Fifth and Fourteenth Amendment of the United States Constitution;

b.    That the Defendants unlawfully used a quick take procedure to obtain the Condemned Property under R.I. Gen. Laws § 24-1-1 *et seq.* and R.I. Gen. Laws § 32-4-1 *et seq.*, and that the Condemnation Order and all rights flowing therefrom are *ultra vires* and invalid;

c.    That if the Taking was valid, the Town took the Property for economic redevelopment purposes and therefore owes Soscia 150% of the fair market value of the Property;

d.    That any and all action taken by the Town based upon Resolution No. 2024-37 and Ordinance No. 2024-03, which were voted on by Pascua who has a direct, financial conflict of interest, are *ultra vires* and invalid;

e.    That because Resolution No. 2024-42 was passed without a quorum and in violation of the Town's Home Rule Charter and is *ultra vires* and invalid, along with any subsequent action stemming therefrom;

f.   That Plaintiffs are entitled to a *pro tanto* distribution without any prejudice to their rights; and

g.   That Resolution No. 2024-42 recorded at Book 2302, Page 871 of the Land Evidence Records on June 20, 2024, Order recorded at Book 2303, Page 506 in the Land Evidence on June 28, 2024, and 2021 Corrective Deed recorded at Book 2222, Page 442 on August 23, 2021, are *ultra vires* and invalid and must be purged from the Land Evidence Records through a recorded Order of this Court.

## Count VI

### *Assessment of Damages – R.I. Gen. Laws § 24-1-8*

401.   Plaintiffs repeat the foregoing allegations in this Complaint as if they were each expressly set forth herein.

402.   In the event the Taking of the Pond and Condemnation Order is upheld as valid, Plaintiffs bring this claim under R.I. Gen. Laws § 24-1-8 for an assessment of damages by this Court.

403.   Plaintiffs are entitled to an award of just compensation for the Taking of the Condemned Property, which is set forth in the Condemnation Order and Resolution, both of which were recorded in the Land Evidence Record by the Town.

404.   The $157,000.00 sum estimated to be just compensation was deposited into the Court Registry on June 28, 2024.

405.   Plaintiffs do not agree to the $157,000.00 estimation of just compensation and submit that the Condemned Property and severance damages to the remainder of Parcel I are worth significantly more than $157,000.00.

406.   This Complaint is brought within 1 year under R.I. Gen. Laws § 24-1-8.

407.   This Court has supplemental jurisdiction over Count VI under 28 U.S.C. § 1367.

408.    Any statute of limitations under R.I. Gen. Laws § 24-1-8 is tolled under 28 U.S.C. § 1367.

**WHEREFORE**, Plaintiffs pray for an assessment of damages pursuant to R.I. Gen. Laws § 24-1-8 by the Court, demand a bench trial pursuant to R.I. Gen. Laws § 24-1-9, and request judgment to enter against the Defendants for damages.

## Count VII

### *Tortious Interference with Prospective Economic Relations*

409.    Plaintiffs repeat the foregoing allegations in this Complaint as if they were each expressly set forth herein.

410.    The Defendants knew of the Plaintiffs' business plans for the Pond after the Lease expired.

411.    In fact, the Plaintiffs notified dock owners they would have to purchase easement rights from Plaintiffs or remove their docks. There were over 900 docks existing on the Pond at that time.

412.    The Defendants intentionally interfered with the Plaintiffs' prospective economic relations relating to the Property and their development thereof.

413.    The Plaintiffs' business is centered around the Property.

414.    Plaintiffs had concrete development plans for the Property.

415.    Defendants knew of Plaintiffs' development plans and business relations.

416.    After the Lease expired and before the condemnation, the Town instructed residents not to remove their docks or boats and provided them assurances. The Town then took the Condemned Property, intentionally interfering with Plaintiffs' development plans.

417.    This interference was improper, unlawful, malicious, and used improper procedures.

418.    Defendants have caused Plaintiffs injuries, as but for Defendants' interference, Plaintiffs would have established its prospective business relations and executed on its development plans, which were already in motion.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in its favor on Count VII against the Defendants and hold Defendants jointly and severally liable as Town Council members and individually for tortious interference with prospective economic relations, including all damages, costs, interest, and attorney's fees associated therewith.

## Count VIII

### *Civil Conspiracy*

419.    Plaintiffs repeat the foregoing allegations in this Complaint as if they were each expressly set forth herein.

420.    As set forth above, the Defendants and others collectively formed an unlawful enterprise and conspired to intentionally violate the Plaintiffs' constitutional rights and cause tortious harm.

421.    Each of the Defendants is jointly and severally liable because of their role in the civil conspiracy.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in its favor on Count VIII against the Defendants and hold Defendants jointly and severally liable as Town Council members and individually for conspiring to violate the Plaintiffs' constitutional rights and tortious interference with prospective economic relations, including all damages, costs, interest, and attorney's fees associated therewith.

*[SIGNATURE BLOCK TO FOLLOW]*

Respectfully submitted,

**SOSCIA HOLDINGS, LLC;
STRUCTURES AT JOHNSON'S POND, LLC;
BOATING AT JOHNSON'S POND, LLC;
WATERFRONT AT JOHNSON'S POND, LLC;
COMMON AREA AT JOHNSON'S POND,
LLC; and LAND AT JOHNSON'S POND, LLC**

By their attorneys,

/s/ *Michael A. Kelly* _____
Michael A. Kelly, Esq. (#2116)
Scott D. Levesque, Esq. (#5654)
Gregory S. Estabrooks, Esq. (#10713)
**KSPR LAW, P.C.**
128 Dorrance Street, Suite 300
Providence, RI 02903
Tel. (401) 490-7334
mkelly@ksprlaw.com

Dated: June 13, 2025