# Exhibit 10

**JUNE 28, 2024**

**MORNING SESSION**

THE COURT:  Will the clerk please call the first case.

THE CLERK:  Yes.  The matter before the Court is KM-2024-0578, In Re:  The Town of Coventry. Would counsel identify themselves for the record, please.

MR. ESKEY:  Good morning, Your Honor, Tim Eskey on behalf of the Town of Coventry.

MR. ANGELL:  Good morning, Your Honor, Stephen Angell, Town Solicitor, on behalf of the Town of Coventry.

THE CLERK:  Thank you.

MR. ESKEY:  Your Honor, we're here seeking an order of the Court to deposit in the Court's registry, the Town of Coventry's estimated sum for just compensation of $157,000 for the Town's taking by eminent domain of the property commonly known as Johnson's Pond, the dam at Johnson's Pond, and a 48-acre parcel immediately down the stream of the dam.

Now, while I can be fairly certain that we will be back before the Court at a later date contesting what the worth of the property is when it's only

use is for a pass of recreational use and it takes about $5 million to make it safe for that use. But that's not why we're here today, it's a much more narrow and limited reason, and that's to deposit the estimated sum in the registry of the Court and obtain an order for the Court for that purpose.

We have filed a statement as required by the statute. We followed the process by the Town's adoption of an acquisition resolution, a plan, and a description of the property taken. We filed a statement before the Court. We have, in seeking the order, complied with the process. And on the deposit of the estimated sum in the Court's registry --

THE COURT: Can I interrupt you?

MR. ESKEY: Please, Your Honor.

THE COURT: So I've read the town charter. It says that the Town may acquire a property within or without its corporate limits for town purposes and fee or any lesser interest or estate by purchase, lease, gift, devise, and by condemnation within the town for public use. Can you describe what the proposed public use is?

MR. ESKEY: Yes, Your Honor. In the acquisition resolution, which is part of the papers

we filed for the court, the purposes are stated as for the purpose of environmental protection and conservation, for public safety, and for public access to and recreational use of Johnson's Pond.

THE COURT:  I've had the benefit of hearing Mr. Angell on the radio by accident, to be honest.  I don't know why my radio was tuned into that station that day, but he was on with Mr. York.  Because normally I don't listen to talk shows because once you're out of politics, you don't have to listen to talk shows anymore.

But Mr. Angell was on and very articulately explaining this, but it's not on the record.  He was talking about uses by the public what is beyond the residents of Johnson Pond.  So if you could just tell me for the record what those are because it goes to the public use.  And if Mr. Angell wants to --

MR. ESKEY:  I don't think there's anyone better who could say this.

MR. ANGELL:  Good morning, Your Honor.  Your Honor, the council has passed a series of resolutions which are part of the Court's appendix for application here this morning.  The council is resolute in making sure, Your Honor, that there is

public access for the broader public other than just those residents of Johnson's Pond. They're looking to make sure that the public has access and they intend to have a public beach, they intend to have public parking, they intend to have a cabana, boat ramps that presently are not usable boat ramps in that area, for broader public recreational use and to provide that benefit to the public as a whole, not just for the citizens of Coventry, Your Honor, but also on a fee basis for those who may not live in Coventry as a nonresident.

THE COURT: Okay. Thank you.

MR. ANGELL: Thank you, Your Honor.

THE COURT: I just wanted that on the record.

MR. ESKEY: So, Your Honor, to the extent there are further questions, obviously, we're prepared to answer those questions, but otherwise we would rest on the papers and be fine.

THE COURT: I have looked at Mr. Andolfo's statement. I just want the most recent affidavit which you were kind enough to provide me yesterday. Could you just walk me through the math?

MR. ESKEY: Yes, Your Honor. So Mr. Andolfo is an appraiser --

THE COURT: If he were here I would accept him

as an expert.  So the record reflects, when I was practicing law I used Mr. Andolfo as an expert, as I did many other appraisers.  So I just want to know how you got to the 157.  I think he says it all, but I'd like you to explain it to me.

MR. ESKEY:  So in his reports Mr. Andolfo appraised the market value of the property and he essentially divided the property into two segments. There's the pond and the dam which is one segment, and there's a piece of property that's downstream of the dam that has development potential.  And as far as the dam and pond property are concerned, Mr. Andolfo found that hypothetically it has a value of almost $3 million.

The upland property, the downstream property, with the developmental potential, again he concluded that it has a hypothetical value of $3.5 million.  And that's assuming that the appropriate approvals and permits can be obtained.  So in gross terms --

THE COURT:  But he's divided that into two parcels?

MR. ESKEY:  That is net of cost, site development cost.

THE COURT:  No.  But didn't he divide the

development into two parcels, one of which you're taking and one of which you're not taking?

MR. ESKEY:  Yes, I'm getting to that.

THE COURT:  Oh, I'm sorry.

MR. ESKEY:  No, it's a good question because originally the Town was going to take the entire upland parcel which is just over a hundred acres. Ultimately, the Town determined that it wasn't necessary to take all of that so we've taken a 48-acre portion that's immediately adjacent to the dam for access to the dam, for maintainance and repair and improvement of the dam, leaving to the present owner the remainder of that upland parcel for development purposes.

So initially though when Mr. Andolfo did his appraisal, he considered the entire parcel.  And that's where the $3.5 million initial figure came from.  And the value of the pond space was about $3 million, so combined it had a value of $6.4 million.

However, what needed to be subtracted from that was the cost of improving and preparing the dam which costs are approximately $5 million overall. So when you take from the $6.4 million of that amount, that was the initial thing.  But when the

property was divided Mr. Andolfo went back and he put a value on the piece of property that was being taken, and that was $790,000.  So what he did then finally was the value of the pond and open space was about $2 million, $2.5 million.

THE COURT:  It was $2.952.

MR. ESKEY:  Yes.  Added to that is the value of the parcel being taken, a 48-acre parcel which is $790,000, and combined that has a value of $3,742,000 according to Mr. Andolfo.  Subtracted from that is the cost of the dam repair and improvements that are necessary.  That's $3,585,000.

When you do that math then you end up with the as his market value, according to Mr. Andolfo, $157,000.  So that's where the figure of the estimated just compensation comes from, Your Honor.

THE COURT:  Thank you.

MR. ESKEY:  Thank you, Your Honor.

THE COURT:  Anything further?

MR. ESKEY:  We have submitted a proposed order to the Court.  And obviously, vesting as soon as possible is in the interest of the Town --

THE COURT:  The statute requires vesting.  In order to vest, when I approve this you have to

deposit the money, assuming I approve it.

MR. ANGELL:  We're prepared to pay this morning, Your Honor.

THE COURT:  Okay.  The Court has reviewed the papers that have been submitted and the Court is prepared to enter the order that has been proposed and the Court accepts for purposes only of this hearing and this procedure, the estimate value given by Mr. Andolfo.

It was subject to the statutory right of the condemnee to petition for an assessment of damages. And after hearing, at some point, if they choose to do that, I would be very surprised if they didn't, but that's for another day.

If they choose to do that, the Court will ultimately make a decision on the value based upon, I assume Mr. Andolfo's testimony where he's subject to, I think it was cross-examination and the experts that the condemnee will undoubtedly present to the Court and that person or persons will also be subject to vigorous cross-examination.

And when I say cross-examination, I also add questioning because it's a bench trial that I may ask some questions of all the experts who end up testifying.  But for purposes of today, this order

is appropriate.  I think the Town Council acted pursuant to the authority, granted by the Home Rule Charter which I'll point out was approved by the General Assembly of the State of Rhode Island.

So, as such, I will sign this order and it will be entered and we'll go from here.

MR. ANGELL:  Thank you, Your Honor.

MR. ESKEY:  Thank you, Your Honor.

THE COURT:  The clerk will sign and enter it.

**A D J O U R N E D**

STATE OF RHODE ISLAND
KENT, SC.                                    SUPERIOR COURT

IN RE:  TOWN OF COVENTRY            No. KM-2024-0578

**HEARD BEFORE
THE HONORABLE JUSTICE RICHARD A. LICHT**

**JUNE 28, 2024**

**<u>APPEARANCES</u>:**

FOR THE TOWN OF COVENTRY:

STEPHEN J. ANGELL, ESQUIRE
TIMOTHY M. ESKEY, ESQUIRE

**PAULA CAMPAGNA, CCR
OFFICIAL COURT REPORTER**

*C-E-R-T-I-F-I-C-A-T-I-O-N*

I, **Paula J. Campagna**, hereby certify that the succeeding pages 1 through 11 inclusive, are a true and accurate transcript of my stenographic notes.

*Paula Campagna*
_____
PAULA CAMPAGNA, CCR
OFFICIAL COURT REPORTER