**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| SOSCIA HOLDINGS, LLC, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| vs. ) | |
| ) | Case No.: 1:25-cv-00274-MRD-AEM |
| TOWN OF COVENTRY, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**DEFENDANT STEPHEN ANGELL'S MOTION FOR**
**JUDGMENT ON THE PLEADINGS**

Defendant Stephen Angell moves for judgment on the pleadings because Plaintiffs Soscia

Holdings, LLC, et al. ("Soscia") fail to link their "unjust compensation" to Mr. Angell, plausibly

allege the inadequacy of that compensation, or explain why it was unreasonable for him to request

and/or rely on two expert reports.  This motion is supported by *Fed. R. Civ. P.* 12(c) and the

following points of law and argument.

**BACKGROUND**

Stephen Angell was the Town Solicitor for the Town of Coventry, and Soscia has sued him

in both his official and individual capacities.  (Para. 17).[1]  Soscia's alleged damages arise from

the Town of Coventry's condemnation of Johnson's Pond (the "Pond"), along with abutting land

and certain rights held by Soscia (collectively the "Condemnation").  (Page 2).  The Town's

decision to take the Pond for its own use dates to sometime in 2023.  (Para. 122).  According to

the First Amended Complaint, Mr. Angell's role in the Condemnation was as follows.

On June 14, 2023, Mr. Angell retained GZA GeoEnvironmental, Inc. to inspect the

Johnson's Pond dam on behalf of the Town.  (Para 123).  Then, on December 19, 2023, he led an

---

[1] Citations to "Para." or "Page" refer the numbered paragraphs and pages of the *First Amended Complaint* (ECF 34).

executive session (the "Executive Session") of the Town Council "to discuss the planned Condemnation." (Paras. 125, 140). Mr. Angell began by explaining that in connection with "the Town taking over the Pond," the Town was conducting an appraisal, (Para. 142), but that the appraiser had "encountered some difficulties" because there were "multiple deeds for multiple parcels that list flowage." (Para. 143). The deeds contained discrepancies, so the Town would "definitely want to see a survey and some title work to reconcile the language in the deeds." (Para. 154). Mr. Angell "talked about repairs needed to the dam [and] said that Soscia has no end game when it comes to generating revenue." (Para. 163). "Mr. Angell then went into a discussion about how much a condemnation would cost and how the Town would pay for it." (Para. 145). "A solution he proposed was a tax increment financing ('TIF') district." (Para. 146). Mr. Angell also stated that a redevelopment authority would be necessary. (Para. 152).

Pursuant to Mr. Angell's presentation to the Town Council during the Executive Session, "on January 23, 2024, the Town Council adopted Resolution No. 2024-4, which affirmed the 'need for a Coventry Redevelopment Agency and Appointing Members to the Coventry Redevelopment Agency.'" (Para. 168). Mr. Angell approved the resolution "as to form and substance." (Para. 169). Subsequently, on April 29, 2024, Mr. Angell presented Soscia with the Town's offer to purchase for $1,527,000.00. (Para. 176). Soscia did not respond. (Para. 178). Thereafter, at a press conference, on March 26, 2025, Mr. Angell stated: "He wanted $100 million dollars, and when that didn't work, he wanted $61 million dollars. I want to be an Olympic athlete. Let's see who gets lucky first." (Paras. 171, 173).

On May 2, 2024, the Town Council adopted Resolution No. 2024-37, "[m]aking plain the Town Council's intentions and commitment to acquire, maintain, and redevelop Flat River Reservoir ('Johnson's Pond'), its Dam, dam structures, and land to protect the environment, to

ensure public safety, and to provide recreational access to the public." (Para. 179). On May 9, 2024, the Town Council performed the first reading of Ordinance no. 2024-03, "endorsed by Mr. Angell." (Para. 181, 183). It stated that the purpose of the Condemnation was to "redevelop Johnson's Pond," (Para. 181), and required the Town to acquire "the Dam, dam structures, Pond, and associated property at Johnson's Pond, including any and all property, rights, and interests acquired by Soscia Holdings, LLC …." (Para. 182).

On June 20, 2024, the Town Council moved forward with the Condemnation by passing Resolution No. 2024-42. (Para. 184). Mr. Angell approved the resolution "as to form and substance," which passed on a vote of 3-0. (Para. 186). This resolution set forth: (i) the claimed purpose of the Condemnation (i.e., "environmental protection and conservation, public safety, and public access to and recreational use of Johnson's Pond"); (ii) a description of the condemned property, which was all of Parcel II (the Pond), and only a portion of Parcel I (the Upland Parcel) as described in the Soscia Deed from 2020 (the "Condemned Property"); and (iii) the "just compensation" for the Condemnation, "which was set at $157,000.00 by the Town." (Para. 187). Mr. Angell "intentionally led the Appraiser to arrive at this figure by engaging GZA and instructing them to generate the 'dam study' which erroneously concluded that future repairs and future improvements for the dam would total $3.585 million." (Para. 254). He was also "fully aware that an incorrect acreage had been given to the Appraiser." (Para. 254).

At the June 20, 2024, meeting, Mr. Angell made the following admissions:

a. "The Town's taking of the Condemned Property was 'unprecedented;'"

b. "That there 'is no state statute that allows the Town to do this,' so the taking would have to be conducted under the Town's Home Rule Charter, although they were also following 'a state framework that does exist for other matters that are similar but not identical;'"

c. "That the Town was in 'uncharted territory.'"

(Para. 193). In addition, he stated that there were "wild inconsistencies as to the estimated acreage in this area." (Para. 195).

The Town then filed a condemnation petition in the Superior Court. (Para. 198). A hearing was held on June 28, 2024. (Para. 199). "At the hearing, Mr. Angell represented the Town." (Para. 200). Soscia had no "formal notice" and did not attend. (Para. 199). Mr. Angell's "statements to the Superior Court on behalf of the Town were untruthful." (Para 203). He told the Court that the Condemnation was "for broader public recreational use and to provide that benefit to the public as a whole[.]" (Para. 200). He made no mention of the Town's previous planning for "a redevelopment taking - which included its subsequent creation of a redevelopment agency – or the Town's planned creation of a TIF district to facilitate the Taking." (Para. 202). "At best," Mr. Angell's statements "constituted material omissions of fact; at worst, they constituted outright fraud on the Court." (Para. 204). Just days prior, he had admitted that there was "no state statute that allows the Town" to conduct the Condemnation. (Para. 205). The Court, nonetheless, approved the Condemnation and issued an order to that effect. (Para. 206).

## STANDARD OF REVIEW

"The standard of review of a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is the same as that for a motion to dismiss under Rule 12(b)(6)." *Doe v. Brown Univ.,* 304 F. Supp. 3d 252, 258 (D.R.I. 2018), quoting *Frappier v. Countrywide Home Loans, Inc.,* 750 F.3d 91, 96 (1st Cir. 2014). The Court must view "the facts contained in the pleadings in the light most favorable to the nonmovant and draw all reasonable inferences therefrom," and then decide if the complaint "contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.*, quoting *In re Loestrin 24 Fe Antitrust Litig.,* 814 F.3d 538, 549 (1st Cir. 2016). This standard requires the Court to "separate wheat from

chaff;" that is, to separate "the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." *Mello v. Gustafson,* 2025 WL 2083739, at 1 (D.R.I. July 23, 2025), quoting *Kando v. Rhode Island State Bd. of Elections*, 880 F.3d 53, 58 (1st Cir. 2018).

## DISCUSSION

The elements of liability under § 1983 are: (1) the deprivation of a federal right, (2) a causal connection between the actor and the deprivation, and (3) state action. *Sanchez v. Pereira–Castillo*, 590 F.3d 31, 41 (1st Cir. 2009), citing 42 U.S.C. § 1983. The following focuses on the causation element, which "is evaluated according to common-law tort principles." *Id*. at 50. An officer may cause a deprivation of constitutional rights if he "sets in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Id*. (internal quotes omitted). In this matter, Soscia has averred nothing that casts Mr. Angell in such a role, and fails to plausibly allege the inadequacy of the appraisal or dam study that informed the amount of compensation paid for the Condemnation. The following sets forth these arguments and a qualified immunity defense in detail.

1. <u>Soscia's claims of animosity and untruthfulness are conclusory and inadequate to show causation in a § 1983 action.</u>

In assessing Soscia's allegations concerning causation, the "Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context." *Chhun v. Mortg. Elec. Registration Sys., Inc.,* 84 A.3d 419, 422 (R.I. 2014), quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009). What is required is "a plausible claim for relief." *Id*., quoting *Iqbal*, 556 U.S. at 679. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id*., quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (internal quotation

marks omitted). This means that the Court does not credit "factual allegations that are 'too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture.'" *Stand With US Ctr. for Legal Just. v. Mass. Inst. of Tech*., 158 F.4th 1, 10-11 (1st Cir. 2025), quoting *Legal Sea Foods, LLC v. Strathmore Ins. Co.,* 36 F.4th 29, 33 (1st Cir. 2022).

In multiple instances, Soscia alleges bad faith, malice, prejudice, and animus on the part of Mr. Angell. Soscia has seized on Mr. Angell's alleged animosity, and the like, to show causation. In paragraph 391, Soscia claims that "[s]everal of the Defendants, including Angell, held personal animosity or bias or prejudice against Plaintiffs by reason of preconceived opinions of the individual principals of the Plaintiffs, and <u>this personal animosity was, at least in part, the basis for the violation</u> …." (Para. 391) (emphasis added). However, neither the pleadings nor common sense provide any basis to believe that Johnson's Pond was condemned because Mr. Angell did not like Socia or its principals.

Animosity is not the issue. Section 1983 focuses on whether a defendant acted under color of state law when violating someone's constitutional rights; not whether he liked or disliked the plaintiff. And, though "conditions of a person's mind" may be averred generally, causation cannot be. *Fed. R. Civ. P.* 9(b). Rather, causation must be plausible. *A.G. ex rel. Maddox v. Elsevier, Inc.,* 732 F.3d 77, 82 (1st Cir. 2013) ("we have upheld at least one dismissal for failure to state a claim due to a lack of any plausible allegation of causation"). Therefore, averring that Mr. Angell disliked Socia does nothing to move Soscia's claims over the line between possibility and plausibility.

A similar analysis applies to the claims in paragraph 368 that "Defendants' conduct was extreme, outrageous, and in bad faith" and in paragraph 388 that "Defendants intentionally and with malice violated Plaintiffs' Procedural Due Process rights." (Paras. 368, 388). Nothing in the

pleadings details precisely what conduct of Mr. Angell was extreme or outrageous, or how he intentionally violated Soscia's due process rights. Mr. Angell's role, after all, was to advise the Town. But, he was not on the Town Council and did not decide the Town's course of action. Accordingly, these averments are conclusory and too meager to link Mr. Angell to the deprivation of any federal rights.

Finally, in a few instances, Soscia has alleged dishonesty on the part of Mr. Angell. But, again, the well-pleaded facts do not back this up. In paragraph 203, Soscia claims that "Angell's statements to the Superior Court on behalf of the Town were untruthful." (Para 203). In paragraph 204, they claim that "[a]t best, [those statements] constituted material omissions of fact; at worst, they constituted outright fraud on the Court." (Para. 204). In this regard, Soscia apparently sees an inconsistency in Mr. Angell's statements to the Court set forth in paragraphs 200 through 202, in which he argued the Condemnation was for "for broader public recreational use," but did not mention the Town's "months of planning a redevelopment taking …." (Paras. 200-02). Soscia fails to recognize that these rationales are not mutually exclusive. In fact, following the Superior Court hearing, Mr. Angell described the Town Council's vision for Johnson's Pond as including a new "pavilion of some kind with restrooms with parking" and "an ability to have a contractor or someone else come in as a vendor and rent kayaks and other things that can be utilized for recreational purposes on the Pond." (Para. 218). This vision is consistent with the purpose described to the Superior Court.

Doubling down on the fraud claim, Soscia alleges in paragraph 205 that "Angell had admitted days prior there was 'no state statute that allows the Town' to conduct the Taking." (Para. 205). However, this "no state statute" allegation ignores the Superior Court's Condemnation Order and Soscia's own recognition in paragraph 193 that the Town was "following a state framework

that does exist for other matters that are similar but not identical." (Para. 193). Consequently, the

allegations of animosity, dishonesty, and fraud are not borne out by the facts alleged and do not

establish causation.

    2. <u>Mr. Angell's knowledge that the appraiser was given "an incorrect acreage" is not evidence that he undermined the payment of just compensation because the appraisal did not turn on the precise acreage of the Condemnation.</u>

Soscia's amended complaint claims that Mr. Angell "was fully aware that an incorrect

acreage had been given to the Appraiser," (Para. 254), and that he "admitted there were 'wild

inconsistencies as to the estimated acreage in this area.'" (Para. 195). The appraiser's report,

however, is attached to the amended complaint. (Ex. 25). The appraiser was Mr. Thomas S.

Andolfo, MAI, SRA, AI-GRS, and he described his task as follows:

> I have been engaged by counsel for the Town of Coventry ("Town") to appraise and opine on the as-is, fee simple market value of the property in Coventry, Rhode Island acquired by Soscia Holdings LLC ("Soscia") from the Quidnick Reservoir Company ("Quidnick") on March 3, 2020, as documented and described in the Quitclaim Deed from Quidnick to Soscia recorded in the Town's land evidence records at Book 2155, pages 847-855 ("Subject Property").

> In sum, the Subject Property consists of the Flat River Reservoir and dam, associated water rights, and an area of undeveloped, open-space land downstream of the Pond and dam (commonly known as Johnson's Pond).

>                                 - - -

> Following the production and delivery of my original appraisal report, counsel for the Town requested that I update my appraisal report based on the assumption that the openspace property downstream of the dam is subdivided into two parcels - one immediately downstream of the dam consisting of about 48 acres and the other consisting of the remainder of the open-space property, which is about 69 acres.

(Ex. 25, pp. 1-2). Mr. Andolfo also explained that "[t]he conclusions reached in this analysis were

based upon my personal inspection of the subject property and the neighborhood area, ...." (Ex

25, p. 23).

Significantly, Soscia does not dispute that "the Subject Property" consists of the reservoir, the dam, the associated water rights, and an area of undeveloped, open-space land. They do not dispute that the open-space land consisted of "two parcels - one immediately downstream of the dam consisting of about 48 acres and the other consisting of the remainder of the open-space property, which is about 69 acres." And, importantly, they do not dispute that Mr. Andolfo conducted a "personal inspection of the subject property and the neighborhood area." Thus, there is no contention that Mr. Andolfo misidentified the component parts of the Condemnation or as Mr. Andolfo termed it, the "Subject Property."

In claiming that Mr. Angell knew that there were inconsistent estimates of the acreage and that "an incorrect acreage" had been given to Mr. Andolfo, Soscia implicitly argues that precise acreage formed the basis of Mr. Andolfo's appraisal. The appraisal expressly contradicts this contention. As the appraisal explains, the standard benchmark is the property's "highest and best use." In this regard, the appraisal states:

> Real estate is valued in terms of its highest and best use; i.e., the reasonably probable use of property that results in the highest value. To be reasonably probable, the use must be physically possible; the use must be legally permissible; and the use must be financially feasible. Uses that meet the three criteria of reasonably probable uses are then tested for economic productivity, and the reasonably probable use that will result in the most profitable or highest value, i.e., the property's highest and best use.

(Ex. 25, p. 27). Mr. Andolfo then proceeded to evaluate five possible uses. (Ex. 25, p. 40). Of the five, three fell short of the "reasonably probable" requirement. (Ex. 25, p. 40). These were scenario 1 - a floating solar array (proposed by Douglas Soscia), scenario 2 – a hydro power plant, and scenario 3 – the draining of Johnson's Pond. (Ex. 25, p. 40). The two remaining possible uses involved either a 32-lot single family subdivision or a 66-unit condominium development. (Ex. 25, p. 40). Ultimately, Mr. Andolfo concluded that the condominium scenario was the highest and best use. But, none of the options were rejected based on acreage calculations. Therefore, Mr.

Andolfo's appraisal report contradicts any contention that just compensation was undermined by his belief as to precise acreage, and Soscia has not alleged a possible use that Mr. Andolfo failed to consider.

3. <u>Because neither Mr. Angell's feelings toward Soscia nor his knowledge of uncertain acreage contributed to the amount of compensation the Town offered, Soscia has failed to allege that Mr. Angell deprived him of a federal right.</u>

To prove Mr. Angell's liability under § 1983, Soscia must show that Mr. Angell set "in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Sanchez*, 590 F.3d at 41 (internal quotes omitted). What is missing from Soscia's prima facie case is the "series of acts" by Mr. Angell that caused others to violate Soscia's rights. Soscia has generally alleged animosity, but this does not show what Mr. Angell has done. They have alleged knowledge of "inconsistencies as to the estimated acreage," but again, this does not show what Mr. Angell has done. They have alleged "extreme, outrageous" conduct, but do not describe that conduct in any detail. And, Soscia has alleged "dishonesty" that was the failure to mention in Court an alternate theory the Town considered for the Condemnation. The foregoing betrays a dearth of well-pleaded facts as to what, precisely, Mr. Angell did, or what he reasonably should have known would lead others to undermine Soscia's just compensation. Such vaguery, by definition, draws no straight lines from Mr. Angell's actions to Soscia's alleged unjust compensation. For these reasons, Soscia has failed to state a claim against Mr. Angell under § 1983.

4. <u>Aside from the failure to allege that Mr. Angell deprived him of a federal right, Soscia's claim of unjust compensation is itself implausible.</u>

In the amended complaint, Soscia repeatedly claims lack of just compensation, despite the Superior Court's approval of $157,000 as "estimated just compensation." (Para. 209). In paragraph 244, they claim "$157,000.00 is insufficient compensation for the Property ...." (Para.

244).  In paragraph 356 and 357, Soscia maintains that "[t]he $157,000.00 deposited into the Superior Court's registry does not bear on this Court's independent analysis under the Takings Clause," and that "[t]he $157,000.00 deposit also represents only a minute fraction of the Just Compensation owed to Plaintiffs." (Paras. 356, 357).  Similar claims of insufficient compensation are peppered throughout Soscia's pleading.  Nowhere in their pleading do they identify the amount that they believe to be fair, or the bases for such a figure.  Soscia presents no competing appraisal. They simply claim that the Town's appraisal, attached to the amended complaint as Exhibit 25, was wrong – influenced by the "erroneous" GZA dam study that foresaw "future repairs and future improvements for the Dam would total $3.585 million." (Para. 254).

Plaintiffs do not dedicate a single line to explaining why the dam repairs or improvements are overstated or unnecessary.  But, Mr. Andolfo did explain in his appraisal how they impact the value of the Subject Property.  To begin, "[t]he Johnson's Pond Dam is classified by RIDEM as of overall fair condition but high hazard - meaning that failure or mis-operation would result in probable loss of human life …." (Ex. 25, p. 25).  Therefore, to obtain permitting and lure potential buyers, the dam repairs would be necessary to show "that the dam had a low probability of structural, mechanical, and hydraulic failures and was able to have planned seasonal and/or emergency releases in response to extreme water flows." (Ex. 25, p. 40).  While not denying the RIDEM classification of the dam, Soscia presents no explanation as to why or where the GZA dam study went wrong.

Finally, the Town's $157,000 just compensation figure derives from a valuation of $3,742,000 for the Subject Property, less the GZA dam repair estimate of $3,585,000. (Ex. 25, p. 2).  This $3,742,000 figure compares favorably to the $1,700,000 purchase price that Soscia paid to acquire the Subject Property in 2020, when it consummated the transaction, presumably, without

evaluating the dam.[2]  (Ex. 25, p. 23).  If one were to set aside consideration of dam repair costs, as Soscia did in 2020, the Andoflo valuation of $3,742,000 comes in over two million dollars higher than what Soscia paid just four years prior.  That is a remarkable gain.  Soscia's failure to consider the dam repairs in 2020 or maintain the dam after purchasing the Subject Property does not make the Town's proffered compensation unjust. Absent expert analysis of its own, Soscia's claims that the $3,742,000 appraisal or $3,505,000 GZA dam repair estimate are "erroneous" are not plausible.

> 5. <u>Even if Mr. Angell set in motion the violation of Soscia's right to just compensation, qualified immunity shields him because Soscia has alleged no facts indicating that requesting the dam study and appraisal was unreasonable.</u>

Lawyers do not appraise the value of land.  They do not assess the integrity of dams.  They counsel clients to help them achieve their objectives, and that is what Mr. Angell was doing when he requested the dam study and appraisal that are at the heart of Soscia's unjust compensation claim.  To present this conduct as a triable § 1983 claim, Soscia must plausibly allege why it was unreasonable for Mr. Angell to request or rely on that information.  It is a showing that the amended complaint assiduously avoided.  As such, the claim is subject to attack under the doctrine of qualified immunity.

"The qualified immunity doctrine is designed to afford officials an added measure of protection against civil liability." *Morales v. Chadbourne*, 235 F.Supp.3d 388, 399 (D.R.I. 2017), quoting *Cox v. Hainey*, 391 F.3d 25, 31 (1st Cir. 2004).  "To achieve that goal, the doctrine eschews a line that separates the constitutional from the unconstitutional and instead draws a line that separates unconstitutional but objectively reasonable acts from obviously unconstitutional acts." *Id*.  Traditionally, "[i]n order to determine whether an officer qualifies for qualified immunity, the

---

[2] Soscia has not alleged any facts concerning the condition of the dam to support its assertion that the study is erroneous.  Furthermore, Soscia has not alleged that it conducted its own dam study.

Court must determine: (1) whether the facts alleged show that the officer violated a constitutional right; and (2) if so, whether that right was clearly established at the time of the event." *Id*., citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). This order of analysis is sometimes referred to as the *Saucier* protocol. See, e.g., *Pearson v. Callahan*, 555 U.S. 223, 231, 237 (2009), discussing *Saucier v. Katz*, 533 U.S. 194 (2001). That protocol, however, is no longer mandatory. *Id*. at 236.

"[T]he 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims' against government officials will be resolved prior to discovery." *Id*. at 231, quoting *Anderson v. Creighton*, 483 U.S. 635, 640, n.2 (1987). Accordingly, the Supreme Court "repeatedly ha[s] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Id*. at 232, quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). With this objective in mind, the Supreme Court in *Pearson* reexamined the two-step protocol that required courts to first resolve whether the facts make out a violation of a constitutional right, and only thereafter address whether the right was clearly established. *Id*. The Court noted that the rigid *Saucier* protocol came "with a price." *Id*. at 236. The Court explained:

> The procedure sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case. There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right. District courts and courts of appeals with heavy caseloads are often understandably unenthusiastic about what may seem to be an essentially academic exercise. Unnecessary litigation of constitutional issues also wastes the parties' resources.

*Id*. at 236-37; see also *Dirrane v. Brookline Police Dept.,* 315 F.3d 65, 70 (1st Cir. 2002) (questioning whether the *Saucier* protocol is appropriate when "a violation may depend on a kaleidoscope of facts not yet fully developed"). Recalling that "[q]ualified immunity is 'an immunity from suit rather than a mere defense to liability,'" *id*. at 237, quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis deleted), the Court observed that the two-step protocol "disserves the purpose of qualified immunity when it forces the parties to endure additional

burdens of suit—such as the costs of litigating constitutional questions and delays attributable to resolving them—when the suit otherwise could be disposed of more readily." *Id*. (internal quotations omitted). For these reasons, *Pearson* abrogated the requirement that trial courts first determine whether a constitutional violation occurred when it is clear that the officer's alleged conduct, if proven, was not obviously unconstitutional. *Id*. at 242.

A taking without just compensation is, of, course, unconstitutional. But, qualified immunity "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Lopera v. Town of Coventry*, 652 F. Supp. 2d 203, 211 (D.R.I. 2009), quoting *Pearson*, 555 U.S. at 231. In this instance, Mr. Angell's alleged error was a mistake of fact, i.e., whether it was unreasonable for him to request or rely on the GZA dam study and Mr. Andolfo's appraisal. Nothing in the amended complaint suggests that it was. And, in any event, mere unreasonability would not suffice. To survive qualified immunity, the unreasonable conduct would have had to be "obviously out-of-bounds." *Velez v. Eutzy*, 152 F.4th 292, 303 (1st Cir. 2025). This is necessary because "qualified immunity operates 'to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002), quoting *Saucier*, 533 U.S., at 206. Soscia has failed to allege well-pleaded facts placing Mr. Angell on such notice. For these reasons, qualified immunity protects Mr. Angell against Soscia's § 1983 claims.

### CONCLUSION

For the reasons set forth herein, the amended complaint of Plaintiffs Soscia Holdings, LLC, et al. fails to allege a violation of 42 U.S.C. §1983 against Defendant Stephen Angell and must be dismissed as a matter of law.

Dated: May 28, 2026

The Defendant, Stephen Angell,
By his Attorney,


/s/ *J. Richard Ratcliffe*
J. Richard Ratcliffe, # 412510
Ratcliffe Harten Galamaga, LLP
40 Westminster Street, Suite 700
Providence, R.I. 02903
Tel: (401) 331-3400
Fax: (401) 331-3440
rratcliffe@rhgllp.com

### REQUEST FOR HEARING

Counsel for Mr. Angell requests one hours of time for oral argument.

### CERTIFICATE OF SERVICE

I, J. Richard Ratcliffe, certify that on May 28, 2026, I filed and served this document via

the ECF system, through which it is available to all registered counsel.


*/s/ J. Richard Ratcliffe*